

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

## NO. AP-76,674

---

## EX PARTE PEDRO SOLIS SOSA, Applicant

---

## APPLICATION FOR WRIT OF HABEAS CORPUS FROM THE 81ST DISTRICT COURT, ATASCOSA COUNTY

---

*Womack, J., delivered the opinion of the Court, in which Keller, P.J., and Price, Johnson, Keasler, Hervey, Cochran, and Alcala, JJ., joined. Meyers, J., did not participate.*

Shortly after the applicant and his nephew committed robbery at a La Vernia bank in 1983, the applicant murdered a Wilson County Sheriff's Deputy. At a trial in which the applicant's confession was admitted into evidence and the nephew testified against him, the applicant was convicted of capital murder and sentenced to death.[1]

---

[1] *Sosa v. State*, 769 S.W.2d 909 (Tex. Cr. App. 1989).

The applicant filed this habeas corpus application in 2006, alleging actual innocence and mental retardation. After the judge of the convicting court heard evidence and found that the applicant had not proved his actual innocence but had proved his mental retardation, we filed and set the case to review the findings. We shall remand this case to the convicting court for the judge to consider the factors we established in *Ex parte Briseno*.[2]

## I. Mental Retardation and the Eighth Amendment

The United States Supreme Court has determined that the Eighth Amendment to the Federal Constitution bars the execution of the mentally retarded.[3] After determining that there was a "national consensus" regarding the execution of the mentally retarded, the Supreme Court gave two reasons why this national consensus should be enforced via the Eighth Amendment's bar against cruel and unusual punishment. First, neither of the two rationales for the death penalty that the Court has recognized as legitimate – retribution and deterrence – applies to cases involving the mentally retarded: because of the "lesser culpability" of the mentally retarded, their crimes will never merit the greatest form of retribution, death; and because of their reduced ability to engage in the "cold calculus" of determining whether to commit capital murder, the mentally retarded are unlikely to be affected by the deterrence value of the death penalty.[4] Second, because of the reduced ability of the mentally retarded to aid in their own defense, there

---

[2] 135 S.W.3d 1 (2004).

[3] *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

[4] *Id*., at 318-320.

is a "special risk" that they will be sentenced to death under circumstances in which a defendant of ordinary mental abilities would have his life spared.[5]

While there is a national consensus that it is wrong to execute the mentally retarded, the Supreme Court recognized that there is still disagreement "in determining which offenders are in fact retarded."[6] It therefore left to the states "the task of developing appropriate ways to enforce the constitutional restriction …."[7]

In the absence of legislation, we established guidelines in *Ex parte Briseno* for determining whether a defendant had "that level and degree of mental retardation at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty."[8] In doing so, we posed and, declined to answer, the question of whether there was "a national or Texas consensus that *all* of those persons whom the mental health profession might diagnose as meeting the criteria for mental retardation are automatically less morally culpable than those who just barely miss meeting those criteria."[9] We adopted the definition of "mental retardation" then in use by the American Association on Intellectual and Developmental Disabilities (AAIDD).[10] That definition had three parts: (1) significantly subaverage general

---

[5] *Id.*, at 320-21.

[6] *Id.*, at 317.

[7] *Id.*

[8] 135 S.W.3d, at 6.

[9] *Id.* (emphasis added).

[10] At the time of *Briseno*, the organization was known as the American Association on Mental Retardation. It has since changed its name.

intellectual functioning, generally shown by an IQ of 70 or less, (2) accompanied by related limitations in adaptive functioning, (3) the onset of which occurs prior to the age of 18.[11]

Whether a defendant meets the first part of this definition is determined by scores on IQ tests, which provide a fairly objective basis for a determination.[12] The question of whether that defendant has limitations in adaptive functioning, however, is "exceedingly subjective."[13] We listed seven factors that "factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder":

> Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, and authorities—think he was mentally retarded at that time, and, if so, did they act in accordance with that determination?
> Has the person formulated plans and carried them through, or is his conduct impulsive?
> Does his conduct show leadership, or does it show that he is led around by others?
> Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
> Does he respond coherently, rationally, and on point to oral or written questions, or do his responses wander from subject to subject?
> Can the person hide facts or lie effectively in his own or others' interests?
> Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?[14]

---

[11] *Id.*, at 8.

[12] *See Ex parte Hearn*, 310 S.W.3d 424, 429-30 (Tex. Cr. App. 2010) (to prove significantly subaverage general intellectual functioning, clinical judgment may inform the interpretation of IQ scores, but cannot replace them).

[13] *Briseno*, 135 S.W.3d, at 8.

[14] *Id.*, at 8-9.

While we did not make consideration of any or all of these factors mandatory, they reflected our concern that the AAIDD's guidelines should not be considered in isolation, but rather in the context of the concerns expressed by the Supreme Court in *Atkins*.

The *Briseno* factors indirectly get to the question: Are the defendant's limitations in adaptive functioning the sort of limitations that result in his being less morally culpable, less responsive to deterrence, and less capable of assisting in his own defense, such that it would violate the Eighth Amendment to execute him? In cases of severe mental retardation, the answer to that question will certainly be "yes." But in borderline cases, where IQ scores are near the threshold of mild retardation, it is important to recognize that "the mentally retarded are not 'all cut from the same pattern ….'"[15] As the Supreme Court noted in *Atkins*, "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus."[16] Answering questions about whether the defendant is mentally retarded for particular clinical purposes is instructive as to whether the defendant falls into the "range of mentally retarded offenders" protected by the Eighth Amendment, but it will not always provide a conclusive answer to that ultimate legal question.

## II. Writ Proceedings in This Case

### A. IQ and Adaptive Behavior Scores

The judge of the convicting court heard testimony over several days in February and April 2008 regarding the applicant's claims of mental retardation and actual innocence. The applicant and the State each presented an expert witness to testify regarding the mental-retardation claim.

---

[15] *Id.*, at 6 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985)).

[16] *Atkins*, 536 U.S., at 317.

The applicant also presented several fellow inmates to testify regarding his intelligence and adaptive functioning in prison. Regarding his actual-innocence claim, the applicant presented the testimony of his nephew (who recanted his 1984 trial testimony and said that it was a different man who was with him at the bank robbery and who shot the deputy) and his brother (who said that the nephew told him shortly after being arrested in 1983 that it was a different man, not the applicant, who was his accomplice at the robbery and who shot the deputy).

The two expert witnesses presented different interpretations of the various IQ scores, ranging from 94 to 39, that the applicant has produced over the years. The applicant's expert, Dr. Ricardo Weinstein, testified regarding recent IQ tests he had administered to the applicant, and discounted the results of prior IQ tests because of a lack of information regarding how the tests were administered and scored. To measure the applicant's adaptive functioning, Weinstein used the Adaptive Behavior Assessment Scales, Second Edition, which is a questionnaire that asks for scaled answers to questions regarding the behavior of the test subject. Weinstein gave the questionnaires to the applicant and his family members, and concluded that, dating back to childhood, the applicant's adaptive functioning was within the lowest 1% of individuals. Weinstein said that the applicant had long-standing problems with such basic functions as maintaining personal hygiene and counting money, and that, while the applicant spoke some Spanish and some English, he was not fluent in either language.

The State's expert, Dr. Roger Saunders testified that, after speaking with the applicant and examining Weinstein's test results, he believed that the applicant was not mentally retarded, but that instead his scores were artificially low due to malingering. Saunders also criticized Weinstein's findings regarding adaptive functioning, saying that Weinstein's questionnaire

results were not consistent with the life the applicant had lived before going to prison, where he was (more often than not) employed and supported a wife and two children.[17] Saunders disagreed with Weinstein's diagnosis of mental retardation, but said said that the applicant was not retarded, but that the applicant might have a learning disorder and "a possibility that [the applicant] has features of" an antisocial personality.

## B. *Briseno* Factors

On direct examination, the applicant asked Weinstein about the factors that we suggested for consideration in *Briseno*. Weinstein gave brief explanations of what he thought each factor meant, but offered no opinions on how those factors applied to the applicant. Regarding the last *Briseno* factor ("…did the commission of [the] offense require forethought, planning, and complex execution of purpose?"), Weinstein said that the "AAIDD specifically states that the complexity of the crime is not something that you need to look into." Weinstein said that he did not ask the applicant about the facts of the offense because of the innocence claim in this case, but that he had read the police report from the original investigation. When the State asked Weinstein whether "the shooting of a witness who can identify subjects shows some thought and aforethought of sequences," Weinstein responded only that it might show a lack of "aforethought of potential consequences[.] I'd certainly much rather be caught and be judged on a bank robbery than a murder of a policeman." Saunders, however, testified that "in a very

---

[17] Saunders also criticized Weinstein for giving a quantitative score to the applicant's adaptive behavior. In its findings of fact, the judge of the convicting court gave as one of the reasons for believing Weinstein over Saunders that "[p]ursuant to *Atkins* and *Briseno*, adaptive behavior … can only be determined by clinical assessment and standardized scores derived from testing the individual." Footnote 25 in *Briseno* quoted the AAMR (now AAIDD) as stating that "impairments in adaptive behavior" are "determined by clinical assessment and, *usually*, standardized scales." (Emphasis added.) We do not read *Atkins* or *Briseno* to require a quantitative measurement of adaptive behavior.

general way" he did not believe that Weinstein's diagnosis of mental retardation was consistent with someone who could commit the offense for which the applicant was convicted, though he said he would have to review the case before offering additional opinions.

The judge of the convicting court found Weinstein to be more credible than Saunders, based on expertise and methodology, and found that the applicant had proven his mental retardation by a preponderance of the evidence. In her findings of facts and conclusions of law, the judge included a section on the *Briseno* factors (see p. 4, above), in which she listed each factor and used portions of Weinstein's explanations of the factors. With the exception of the last factor, the judge did not make any findings regarding the applicability of the factors to the applicant. With regard to the last factor, the judge adopted Weinstein's answer that consideration of the factor "conflicts with the AAIDD, which specifically states that the complexity of the crime is not something that needs to be evaluated."

## III. Analysis

### A. The Facts of the Offense

We cannot agree that the facts of the offense are categorically irrelevant to the determination of mental retardation for Eighth Amendment purposes.[18] The capital offense for which an *Atkins* claimant was convicted will generally be one of the best documented events in his life, and certain facts will have been proven to a jury beyond a reasonable doubt. In some cases — and we believe this is one of them — the complexity of the offense and the applicant's role in the offense need to be squared with a finding of mental retardation.

---

[18] Weinstein and the district judge both state that the AAIDD says that the complexity of the offense is irrelevant to diagnosis. The AAIDD manual to which Weinstein cited does not appear in the record.

The testimony at trial came from the applicant's nephew (Leroy Sosa), police investigators, people who were present at the scene of the robbery, and people who saw the applicant's car near the scene of the. Additionally, the applicant's confession was admitted into evidence. While there is some variance between the applicant's confession and Leroy's testimony — Leroy presented the whole scenario as having been planned by the applicant, while the applicant's confession described it as the result of a series of spur-of-the-moment decisions — the fundamental facts of the offense are the same.

The applicant and Leroy drove from San Antonio to Wilson County on November 4, 1983. Near La Vernia, they passed a Wilson County Sheriff's Deputy driving in the opposite direction. The applicant, who was in the passenger seat, suggested that Leroy turn around and flash his lights in order to get the deputy to stop. When Deputy Ollie Childress stopped, Leroy drove up so that the cars were side by side. The applicant then pointed a gun at Childress and told him to move over to the passenger's seat. The applicant got in Childress's car and drove it down a nearby side road. Leroy followed.

After the applicant parked the deputy's car on the side of the road, he took Childress's gun and made Childress take off his shirt. The applicant and Leroy then handcuffed Childress and put him into the trunk of his own police cruiser. The applicant put Childress's shirt on over his own, and after retrieving two paper sacks, a ski mask, and a Halloween mask from the applicant's car, the applicant and Leroy drove the police car – with Childress in the trunk – into La Vernia with the intention of committing robbery at the La Vernia State Bank.

According to both the applicant's confession and Leroy's testimony, the applicant put on the ski mask and Leroy put on the Halloween mask. Thus, while those inside the bank did not see the robbers' faces, we can determine from their testimony which of the robbers was which.

The applicant entered the bank first, followed by Leroy. The applicant went into an office near the door and emerged with a bank vice president held at gun point. The applicant announced that he was robbing the bank, and he said that if everyone remained calm no one would get hurt. He announced that he had a sheriff's deputy in the trunk, and, pointing to Childress's shirt, which the applicant was still wearing, said that he was now the sheriff. As the applicant managed the customers and employees, Leroy handed two sacks to a teller and told her to put money in them.

The witnesses described Leroy as nervous, with several commenting that his legs or arms were shaking. In contrast, one witness said of the applicant that "he acted like maybe he had done this before … he didn't get nervous whatsoever. He kept everything well under control." The witnesses were all in agreement that the applicant appeared calm and was the leader of the robbery.

After the teller put approximately $52,000 into one of the paper sacks[19] and handed it back to Leroy, the applicant told those in the bank not to call the police for twenty minutes, and said that if the police started chasing them he would shoot the deputy through the back seat. The two robbers then left. Leroy got in the car, but the applicant waited near the door for a short period of time. He then went back into the bank and announced that he was still watching. He

---

[19] The robbers left a paper sack at the scene. At the applicant's trial, a fingerprint expert testified that the sack left at the scene had Leroy's fingerprints and the applicant's palm print on it.

reiterated his threat to kill the deputy if they were followed. He then got into the police car, and the robbers drove back to where they had left the applicant's car.

When they stopped, the applicant wiped down the passenger side of the police car to remove fingerprints. The applicant then took the keys from the ignition, walked to the back of the car, opened the trunk, and shot Childress in the neck. In his confession, the applicant gave no reason for doing so. Leroy stated, however, that the applicant said he shot Childress because Childress had seen his face. Leroy and the applicant then got into the applicant's car, with Leroy driving. According to Leroy, after they drove a short way the applicant said that he had forgotten to wipe his fingerprints from the trunk.[20] Leroy drove back to the abandoned police cruiser, where the applicant got out of the car, wiped down the trunk lid, and shot Childress a second time. The applicant then got back into his car and the robbers drove to San Antonio, where they disposed of evidence.

As the result of a Crimestoppers tip, Leroy was arrested six weeks later on December 19. He confessed to the robbery and told police that the applicant was his accomplice. When the police went to arrest the applicant, he had left his house. According to statements the applicant gave later, he avoided police for the next month and a half by living outdoors and in temporary housing arrangements. He was arrested on February 4, 1984.

## B. Issues on Remand

The applicant's brief, after summarizing the evidence of the applicant's mental retardation that was presented at the habeas hearing, states, "It is evident that if [the applicant]

---

[20] This part of the story is not mentioned in the applicant's confession, but neither is it inconsistent with the confession.

truly participated in this offense, he was physically incapable of any role other than a follower."

The record of the applicant's trial, however, shows that he took the initiative to lead his nephew through a bank robbery, and he took the initiative to kill the only witness who could identify him.

There appears to be a marked inconsistency between the evidence of the applicant's actions adduced at the applicant's 1984 trial and the evidence of his abilities adduced at his 2008 habeas hearing. In the current record, we have no basis on which to make a determination of whether a man who committed the offense that a jury found beyond a reasonable doubt in 1984 could have had the disabilities that the applicant proved by a preponderance of the evidence to a habeas judge in 2008.

We remand this case so that the judge of the convicting court can gather information and provide findings as to whether the symptoms of mental retardation that the applicant has alleged are inconsistent with his being able to commit the crime of which he was convicted, and whether, considering the facts of the offense and the applicant's role in the offense, the judge still finds that the applicant is mentally retarded.

Delivered April 25, 2012.
Publish.