Ex parte Steven Anthony
**BUTLER, Applicant.**

No. WR–41,121–02.

Court of Criminal Appeals of Texas.

June 27, 2012.

Richard Burr, Leggett, for Appellant.

Lynn Hardaway, Asst. D.A., Houston, Lisa C. McMinn, State's Attorney, Austin, for State.

## ORDER

PER CURIAM.

On November 10, 1988, Applicant was convicted of the offense of capital murder. The jury answered the special issues submitted under Article 37.071 of the Texas Code of Criminal Procedure, and the trial court, accordingly, set punishment at death. The conviction was affirmed on direct appeal. *Butler v. State*, 872 S.W.2d 227 (Tex.Crim.App.1994). Applicant's initial writ, *Ex parte Butler*, No. WR–41,121–01, was denied on April 28, 1999. Applicant's first subsequent writ, *Ex parte Butler*, No. WR–41,121–02, in which he claimed that his execution would violate the Eighth Amendment's prohibition against the execution of the mentally retarded, was denied on June 27, 2007.

After the United States District Court for the Southern District of Texas denied federal habeas relief, Applicant appealed to the United States Court of Appeals for the Fifth Circuit. The record reflects that the Fifth Circuit has entered an order staying its proceedings in Cause Number 09–70003, styled *Butler v. Thaler*, for Applicant to return to state court to present his claim.

This Court denied Applicant's *Atkins* claim in 2007, after Dr. George Denkowski testified for the State at the hearing on the –02 writ application. *See Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In April 2011, Denkowski entered into a Settlement Agreement with the Texas State Board of Examiners of Psychologists, in which his license was "reprimanded." Pursuant to this Settlement Agreement, Denkowski agreed to not accept any engagement to perform

forensic psychological services in the evaluation of subjects for mental retardation or intellectual disability in criminal proceedings. Applicant thereafter submitted a suggestion that this Court "reconsider on its own initiative" its denial of his *Atkins* claim. On December 14, 2011, we exercised our authority to reconsider this cause on our own initiative. We remanded this cause to the trial court to allow it the opportunity to re-evaluate its initial findings, conclusions, and recommendation in light of the Denkowski Settlement Agreement.

On February 28, 2012, the trial court signed an order adopting the State's Proposed Findings of Fact and Conclusions of Law which recommended that relief be denied. We have reviewed the record and the February 28, 2012 findings of fact and conclusions of law. Based upon the trial court's findings and conclusions and our own review, we deny relief.

IT IS SO ORDERED.

COCHRAN, J., filed a concurring statement in which HERVEY, and ALCALA, JJ., joined.

PRICE, J., filed a dissenting statement in which JOHNSON, J., joined.

COCHRAN, J., filed a concurring statement in which HERVEY and ALCALA, JJ., joined.

I agree that applicant has not established, by a preponderance of the evidence, that he has that level and degree of intellectual disability "at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty."[1] He has not proven that he is mentally retarded for purposes of the Eighth Amendment bar upon execution.[2] I write separately to provide some factual context for that conclusion.

## I.

The evidence at applicant's 1988 capital murder trial showed that he was a successful, independent, "Stop–N–Rob" stick-up artist. The State presented evidence of a string of ten different robberies that applicant committed between May 2, 1986, and September 23, 1986. In this five-month period, applicant killed two clerks in separate robberies, shot a third clerk in another robbery, and sexually assaulted clerks in two other robberies. He had a simple, but effective, *modus operandi* that showed careful planning and thoughtful execution. Here are those robberies and the circumstances surrounding them:

**May 2**  Robbery at the Stop–N–Go in Channelview (Shelton Road).

Applicant killed the clerk, Jeff Johnson, by shooting him in the stomach with a .38 revolver. Applicant confessed to the murder.[3]

1. *Ex parte Briseno*, 135 S.W.3d 1, 6 (Tex. Crim.App.2004); *see also Ex parte Sosa*, 364 S.W.3d 889, 891 (Tex.Crim.App.2012).

2. *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

3. Applicant's written confession to this extraneous capital murder stated, in part, that he parked his 1974 light blue Buick behind the Stop–N–Go and then walked around to the front and looked inside to see that the "kinda fat" clerk was the only person in the store.

I walked up to the counter with the gun (a .38 Special blue steel with a snub nose barrel) out in my right hand and asked for the money. The clerk then put both hands on the counter and just looked at me. I again asked him for the money and I cocked the gun and I told him "now." The clerk did not say anything and just stood there with his hands on the counter. I then pulled the trigger on the gun and walked out of the store and then ran to my car that I had parked in back.

Applicant hid his car behind the store and pulled out his gun only when he saw that the clerk was alone in the store.

**July 3**      Robbery at the Stop–N–Go in Channelview (River Road).[4]

Applicant robbed the clerk, 20–year–old Renee Wallace. When she was alone in the store, he pointed a short, dark gun at her; she opened the cash register and applicant took out all the bills.

**July 28**      Robbery at the Stop–N–Go in Channelview (River Road).

Applicant returned to the same store and, once again, robbed the clerk, Renee Wallace, asking her if she remembered him. She did. Once again, she was alone in the store.

Applicant said, "You know what I'm here for." She did. She once again opened the register, and he once again took all the bills.

Applicant told Ms. Wallace that the store "needed a better security system."

**Aug. 17**      Robbery at the Maxi–Stop 2 in Mont Belvieu off of I–10.

Applicant came into the store from across the road, and asked the clerk, Charlotte Jean Holloway, if she sold Slurpees. When she said, "No," he bought a fountain drink and walked outside.

Applicant came back ten minutes later and asked if she would sell him a beer. Ms. Holloway said "No," because it was a Sunday and not yet noon. He waited in the store until it was noon, then bought a bottle of beer and walked outside again.

Applicant came back a third time, when there were no customers in the store or the parking lot. He walked in very quickly and grabbed Ms. Holloway, pulling a gun out and sticking it in her ribs.

Applicant said, "Give me everything you've got. I want all the money."[5] Ms. Holloway opened the register and applicant pulled out all the bills. As applicant left, he told Ms. Holloway, "If you touch that phone, I will kill you." Then he walked out the door.

**Aug. 27**      Capital murder (charged offense) at Fashion Cleaners on Woodforest Boulevard.

Applicant shot the clerk, Velma Clemons, in the stomach with his .38 Special when she refused to give him money.[6] She was alone in the store when applicant came into the cleaners.

4. This Stop–N–Go was two blocks from the Stop–N–Go where applicant had killed Jeff Johnson two months earlier.

5. Ms. Holloway said that applicant had "cold" eyes: "He looked as though he had no feeling whatsoever."

6. Applicant's written confession set out the chronology of the incident:
On August 27, 1986 about 4:00 p.m. I parked my car, which is a 1974 Buick light blue in color with license plates LBQ–612, on the bank parking lot on Sheldon Road. The bank is located directly across from the cleaners. I walked from the bank parking lot and went to the cleaners. I walked inside and saw the clerk who was a white lady about 50 years old who was wearing glasses and she may have had black hair. I told her that I was there to pick up the cleaning for George Holmes and she went to look for the clothes. She then told me

**Aug. 28**      Robbery at C.W.'s Exxon Quick Stop in Winnie off of I–10.

Applicant parked his car on the north side of I–10 and crossed to the Exxon on the south side of I–10. Applicant walked in, saw that there were no other customers, went to the back of the store, picked up a Coke, and brought it to the clerk, Gwen Blackwell, at the register.

According to his confession, applicant "pulled out [his] pistol, a blue steel 38 caliber revolver, snub nosed, and pointed it at the lady clerk." He said, "Give me your money," so she did. Applicant said that she gave him approximately $350.[7]

**Sept. 8**      Robbery at the Phillips "Freeway 66" gas station on I–10 in Orange.[8]

Applicant parked east of the gas station, pulled up the hood of his car, and put on the emergency flashers to make it look like he had had car trouble.[9]

Applicant came in and asked the clerk, 73–year–old Boyd Ford, if there was a telephone. Mr. Ford said there was one outside, and applicant left when he saw there was a customer in the store. He came back inside after the customer and his small child left.

Applicant said, "Old man, this is it." Mr. Ford looked down and saw the gun applicant was holding. Mr. Ford said, "It's not much here, but you sure in the hell can have it." Applicant took $120 and walked out. Then he ran down the service road where his car was parked out of sight.

**Sept. 10**      Robbery at the Amoco In–and–Out Minimart on I–10 in Jennings, Louisiana.

that she could not find the clothes. She came back to the counter and I then pulled out my gun, which was a .38 Special that is blue steel and with a snub nose barrel. I pointed the gun at her and told her to "give me everything." The lady told me "no" and for me to get out of there. I then walked around behind the counter where the lady was at and asked her again to give me everything and she slapped at me and hit me on the right shoulder. I grabbed her around the neck with my left hand as I had the gun in my right hand, I threw her to the ground and then shot her one time. After I shot her I ran out the door and went to my car on the bank parking lot.

Applicant then drove home and watched the television reports of the murder.

[I] learned that I had been followed and that some one had gotten my license plate number. I then parked my car in the apartment parking lot next to my apartments and took off the license plates and put them in the trunk. I then stole another set of plates off an old model Pontiac from the Woodhollow apartments in Baytown and put them on my car.

7. In his confession, applicant stated,

I put the money in my left rear pocket of my blue jeans. I left the Exxon Station, taking my coca-cola and walked back across IH–10. I drank my coca-cola throwing the bottle on the side of the road. I saw some little kids on the side of the road, playing in the mud, as I was walking back to my blue Buick. I got back to the blue Buick and went south, crossed IH–10 and went through Winnie, by the Police Station.

8. What appears to be applicant's handwritten confession to this robbery is replete with specific details.

9. In his confession, applicant stated that he had stopped his car east of the service station and "raised the hood so that it would look like I had car trouble. I turned the flashers on." After the robbery, applicant explained that "I got to my car, put the hood down. I went west down the service road and got on I–10 toward Louisiana. I went into Louisiana. Later I checked the money, and it was a little bit over $100."

Applicant came into the store at about 8:15 p.m. when the 22–year–old clerk, Madonna Benoit, was alone and talking on the telephone. He walked around the store, then disappeared as Ms. Benoit heard him open and shut the storeroom door. Then applicant came up behind the counter and faced Ms. Benoit. He pulled a gun from his pants, pointed it at her stomach, and said, "Give me your money and you won't be hurt." She opened the register and applicant took the money.

As applicant was walking out the door, Ms. Benoit picked up the phone and told her girlfriend that she had just been robbed. Applicant turned around, said, "What did you say, white bitch?" Then he came back in, went around the counter, shot Ms. Benoit in the left hip, and left.

**Sept. 17**     Robbery and sexual assault at the Fina Station in Winnie.[10]

Applicant came into the store after midnight when the clerk, Winnie Silcox, was alone. He walked to the beer cooler to get a Budweiser, but Ms. Silcox told him "Sir, I can't sell you no beer" because it was after midnight. Applicant said, "Oh, come on, mama, nobody will know." He was dancing and "jiving," but then he reached into his pants and pulled out a black gun. He put it at Ms. Silcox's head and said, "Give me all your money." She opened the register and gave him the money. Then he said, "I want to get in your safe" which was in the storeroom.

Applicant made Ms. Silcox walk back to the storeroom, then he jerked her down by her hair, unzipped his pants, and said, "Come on, bitch, do it like you do your boyfriends. You're going to suck my dick." She did so, as applicant kept pressing his gun into her head. She got sick and started throwing up. After he was done, applicant left.

**Sept. 23**     Robbery and sexual assault at the C.W.'s Exxon Quick Stop (same store as the Aug. 28th robbery).

Applicant came "busting" in the door and confronted the clerk, Frances Hartman, who was alone. He said, "I told you I was coming back, you motherf* * * bitch." He was holding a short, dark gun. Ms. Hartman had never seen applicant before and had no idea what he was talking about. Applicant came up to the register and said, "Open up the register." She did. Then applicant said, "Is this all the money that there is in the till?" When Ms. Hartman said that it was, applicant said, "You're lying," but he scooped the money out.

Applicant then grabbed Ms. Hartman by the wrist and took her into the utility room where he told her, "You've got five seconds to get down on your knees." When Ms. Hartman cried, "Oh, God, I don't think I can do this," applicant pointed his gun at her head, and she performed oral sex on him as he held his gun to her head.

After he was done, applicant told Ms. Hartman she had five seconds to take off her clothes, and he made her turn around and bend over as he sexually assaulted her. After that, applicant grabbed Ms. Hartman's hand and took her across the store to the walk-in cooler where he raped her again. Applicant then dragged her to the bathroom where he made her perform oral sex on him for a second time. Finally, "he just walked out the door and left." [11]

---

10. The Fina Station is located one mile from the C.W. Quick Stop where applicant had robbed Gwen Blackwell some three weeks earlier and where he committed his final robbery on September 23rd.

11. Applicant had left his blue Buick parked down the road from the gas station. A Cham-

During his 1988 trial, not a single defense witness hinted that applicant might be mentally retarded or intellectually disabled. His father, the owner of an independent insurance agency, testified that, during his childhood, applicant was a "very normal, active young man." He was trustworthy and the family never had any problems with him. Applicant had received an honorable discharge from the Army; he had obtained a G.E.D.; he had gone to the Job Corps. Applicant's mother, a nurse, testified that applicant was "a very attentive boy.... He was a good son." He played football, and ran track in high school. "He was an average student. He wasn't an 'A' student. He was average." He quit school in the twelfth grade and then obtained a G.E.D. He was a "good" child, "respectful." He learned the plumbing trade when he was in the Job Corps in Gulfport, Mississippi, and got a plumbing job, but then quit and went to Houston. She could not think of anything in applicant's life that would have caused him to commit capital murder because "[h]e was never in even minor trouble, you know, not even juvenile." Applicant's sister, a college graduate, also testified to his good qualities. Applicant's grandfather, a retired school-bus driver, testified that applicant came from a good family and had never been in trouble. Other family members and neighbors uniformly testified that applicant had never been in trouble before. They could not understand his sudden change.

The jury convicted applicant of capital murder and, based upon the answers to the special issues, the trial judge sentenced him to death. This Court upheld applicant's conviction and sentence on direct appeal and denied relief on his first application for a writ of habeas corpus. After the Supreme Court delivered its opinion in *Atkins*, applicant raised a claim of mental retardation in his federal writ proceeding. The federal district court remanded the case to this Court to review that unexhausted claim, and we sent the case to the judge of the convicting court for an evidentiary hearing.

The trial judge held a seven-day evidentiary hearing in 2006, and she issued a forty-eight-page set of factual findings, concluding that applicant failed to prove that he was mentally retarded. A significant number of those findings relied upon the affidavit of Dr. George Denkowski, a psychologist and expert for the State. Af-

---

bers County deputy stopped to check what he thought was an abandoned car and discovered that the license plates were stolen. The deputy then saw applicant walking toward him from the C & W Quick Stop. Applicant related this incident in his confession:

I walked back toward my light blue 1974 Buick and saw a police car and pulled his pistol [sic].

The officer told me to put my hands up. I kept walking around my car, and I asked him why he had pulled his gun. I didn't raise my hands like he had told me to.

I went around the side of my car, pulled out my 38 caliber revolver and shot at the officer. I shot him two (2) or three (3) times. The officer shot back at me, I think twice. I heard some glass shatter. I then ran north toward the Gulf Station across IH–10. I saw a Firebird and a pick up truck parked on the parking lot. I asked the lady clerk whose Firebird. She said that the owner was gone. I then pulled out my .38 caliber pistol and made her give me the keys to the pick up truck, a brown Ford with floor shift standard.

The police chased me, about 5–6 cars, and I finally realized after a few miles that I couldn't get away. I leaned over and rolled down the pass[e]nger window and threw my 38 caliber blue steel revolver, snub nose, out the passenger window.

I stopped the brown Ford pick up and was arrested after being told to get on the ground.

ter reviewing the record, we denied relief on applicant's mental retardation claim.[12]

The federal district court then denied applicant relief on all of his federal claims, but granted a certificate of appealability on the *Atkins* claim.[13] While the appeal was pending in the Fifth Circuit, applicant obtained a stay in the proceedings to return to this Court to seek reconsideration of his *Atkins* claim because, after the 2006 evidentiary hearing, Dr. Denkowski had reached a Settlement Agreement with the Texas Board of Examiners of Psychologists concerning his work in several death-penalty cases.[14] We again remanded the case to the convicting court "to allow it the opportunity to re-evaluate its initial findings, conclusions, and recommendation in light of the Denkowski Settlement Agreement."[15] The trial judge largely reaffirmed her original factual findings and legal conclusions.

Applicant then filed objections to the convicting court's findings of fact and conclusions of law, arguing that the judge continued to rely upon Dr. Denkowski's evaluations and opinions. To cut through any Gordian knot of disagreement concerning the "battle of the experts," I would simply ignore all of Dr. Denkowski's work in this case because the rejection of applicant's mental retardation claim does not turn upon those opinions or analyses. Like the Court, I do not expressly adopt all of the trial judge's findings of fact and conclusions of law, but I do accept her ultimate factual conclusion that applicant is not mentally retarded and her legal conclusion that his execution is not barred by *Atkins*.

## II.

In *Atkins v. Virginia*,[16] the United States Supreme Court held that those who are mentally retarded may be tried and punished when they commit crimes, but, "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses ... they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct."[17] Additionally, the impairments that the mentally retarded suffer from may "jeopardize the reliability and fairness of capital proceedings[.]"[18] Thus, the Court held that the "cruel and unusual punishments" provision of the Eighth Amendment bars the imposition of the death penalty on a mentally retarded criminal.[19]

---

12. We did not expressly adopt the trial judge's factual findings or conclusions.

13. *Butler v. Quarterman*, 576 F.Supp.2d 805 (S.D.Tex.2008).

14. The Settlement Agreement does not specify the basis for the agreement except to say that Dr. Denkowski had "provided forensic psychological services in capital murder *Atkins* proceedings, having been retained to evaluate certain convicted capital murder Defendants for the existence of mental retardation (intellectual disability)." The Agreement explicitly states that it "is not admissible for any purpose in civil or criminal litigation, including but not limited to any *habeas corpus* or other proceedings seeking to re-litigate an Order that a convicted capital murder defendant

was or was not mentally retarded." I will not speculate outside the record on the basis for this Settlement Agreement, and it expressly stipulates that it is not admissible in any proceeding.

15. *Ex parte Butler*, No. WR–41121–02, 2011 WL 6288411, *1 (Tex.Crim.App. Dec. 14, 2011) (not designated for publication).

16. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

17. *Id.* at 306, 122 S.Ct. 2242.

18. *Id.* at 306–07, 122 S.Ct. 2242.

19. *Id.* at 307, 122 S.Ct. 2242.

In reaching this conclusion, the Court canvassed a number of states whose legislatures had enacted statutes prohibiting the execution of those who are mentally retarded and concluded that this "consensus unquestionably reflects widespread judgment about the relative culpability of mentally retarded offenders[.]"[20] The Court noted that mentally retarded persons "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reaction of others."[21] They frequently act on impulse "rather than pursuant to a premeditated plan, and ... in group settings, they are followers rather than leaders."[22] Therefore, they are less morally culpable for their crimes.[23] They are not capable of the " 'cold calculus that precedes the decision' " to commit murder like those who are most deserving of the death penalty.[24] Thus, they cannot be easily deterred because of their lessened ability "to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses[.]"[25]

Not only are they less culpable than those most deserving of execution, they are more likely to unwittingly confess to crimes that they have not committed and unlikely to give "meaningful assistance to their counsel."[26] They are "typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes."[27]

The Supreme Court noted that, while there may be a consensus concerning the lessened culpability of the mentally retarded, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded."[28]

Because the Texas Legislature had not adopted specific legislation, we established guidelines in *Ex parte Briseno*[29] for determining whether a defendant had "that level and degree of mental retardation at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty."[30] In doing so, we posed, but did not answer, the question of whether there was "a national or Texas consensus that all of those persons whom the mental health profession might diagnose as meeting the criteria for mental retardation are automatically less morally culpable than those who just barely miss meeting those criteria?"[31] We adopted the criteria for "mental retardation" then in use by the American Association on Mental Deficiency (AAMR) and the Texas Health & Safety Code.[32] Those criteria

20. *Id.* at 317, 122 S.Ct. 2242.

21. *Id.* at 318, 122 S.Ct. 2242.

22. *Id.*

23. *Id.*

24. *Id.* at 319, 122 S.Ct. 2242 (quoting *Gregg v. Georgia*, 428 U.S. 153, 186, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

25. *Id.* at 320, 122 S.Ct. 2242.

26. *Id.*

27. *Id.* at 321, 122 S.Ct. 2242.

28. *Id.* at 317, 122 S.Ct. 2242.

29. 135 S.W.3d 1 (Tex.Crim.App.2004).

30. *Id.* at 6.

31. *Id.*

32. *Id.* at 8. *See* TEX. HEALTH & SAFETY CODE § 591.003(13) (2003) (" 'mental retardation' means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period.").

are: (1) significantly subaverage general intellectual functioning, generally shown by an IQ of 70 or less, (2) accompanied by related limitations in adaptive functioning, (3) the onset of which occurs prior to the age of 18. We stated that, while experts—psychologists and clinicians—and their diagnostic opinions may inform and assist in that determination, the ultimate decision concerning mental retardation is one for the factfinder—judge or jury—based upon a totality of the available information.[33] As with a finding of insanity, lay-witness testimony may be considered in proving or disproving mental retardation.[34] And the Supreme Court has recently reiterated the truism that "expert testimony does not trigger a conclusive presumption of correctness," thus factfinders may consider and resolve the tension between expert testimony and their own common-sense understanding.[35]

Whether a defendant meets the first criteria is largely determined by IQ scores, which provide a reasonably objective basis for assessment.[36] The question of whether a defendant has limitations in adaptive functioning, however, is "exceedingly subjective," so we listed seven factors that "factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder." [37] While consider-

---

**33.** *Id.* ("Although experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility.").

**34.** *See Bigby v. State*, 892 S.W.2d 864, 878 (Tex.Crim.App.1994) ("Ultimately the issue of insanity at the time of the offense excusing criminal responsibility lies in the province of the jury, not only as to the credibility of the witnesses and the weight of the evidence, but also as to the limits of the defense itself.") (quotation marks and internal citation omitted); *see also Kansas v. Crane*, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) (noting that "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law"); *In re Hawthorne*, 35 Cal.4th 40, 24 Cal.Rptr.3d 189, 105 P.3d 552, 558 (2005) (mental retardation for purposes of *Atkins* "is not measured according to a fixed intelligence test score or a specific adaptive behavior deficiency, but rather constitutes an assessment of the individual's overall capacity based on a consideration of all the relevant evidence."); *State v. Williams*, 831 So.2d 835, 859 (La.2002), superseded by statute as stated in *State v. Turner*, 936 So.2d 89 (La.2006) (in *Atkins* mental-retardation

hearing, "the trial court must not rely so extensively upon this expert testimony as to commit the ultimate decision of mental retardation to the experts.").

**35.** *Parker v. Matthews*, 567 U.S. ——, 132 S.Ct. 2148, 2153, 183 L.Ed.2d 32 (2012) (per curiam).

**36.** *Ex parte Briseno*, 135 S.W.3d at 7 n. 4.

**37.** *Id.* at 8–9. Those factors are:

- Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, did they act in accordance with that determination?
- Has the person formulated plans and carried them through or is his conduct impulsive?
- Does his conduct show leadership or does it show that he is led around by others?
- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
- Can the person hide facts or lie effectively in his own or others' interests?
- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require

ation of any or all of these factors is not mandatory, they reflect our concern that the mental-retardation criteria should not be considered in isolation, but rather in the context of the concerns expressed by the Supreme Court in *Atkins*.[38]

## III.

Applicant argues that we should reconsider his *Atkins* claim without reference to Dr. Denkowski, his testing, his analysis, and his opinions. I have re-analyzed the totality of the evidence without consideration of Dr. Denkowsi and concluded that the record supports the trial judge's factual conclusion that applicant is not mentally retarded for purposes of *Atkins*.[39]

### A. Significant Subaverage Intellectual Functioning.

Applicant argues that he has established that he has significantly subaverage intellectual functioning based upon his IQ scores. Applicant scored an IQ of 80 on the Wechsler Intelligence Scale for Children ("WISC") in 1974 when he was eleven years old. This is the only IQ test applicant took before the *Atkins* decision in 2002. Applicant and his expert, Dr.

Keyes, argue that this score should be reduced to 72 because of "The Flynn Effect."[40] Dr. Keyes administered the WAIS–III to applicant in 2003 and he obtained a Verbal IQ of 70, a Performance IQ of 79, and a Full–Scale IQ of 72. Applicant argues that, considering the five-point standard deviation of error, his true IQ could be as low as 67 (or as high as 77). The judge concluded that a 72 IQ was not consistent with applicant's results on the Woodcock–Johnson Psychoeducational Battery which Dr. Keyes also administered to applicant. On that test, which is scored in the same manner as an IQ test, applicant scored 89 in Oral Language, 83 in Broad Reading, 94 in Math Calculation Skills, 84 in Academic Skills, 79 in Academic Fluency, 80 in Word Letter Identification, 85 in Reading Fluency, 96 in Story Recall,[41] 88 in Understanding Directions, 94 in Calculation, 94 in Math Fluency, 88 in Spelling, 79 in Writing Fluency, and 90 in Passage Comprehension. These scores are internally consistent and consistently higher than one who had mental retardation would likely achieve. The judge found that "applicant's Woodcock–Johnson scores indicate that the applicant's general intellectual functioning is not significantly

> forethought, planning, and complex execution of purpose?
> *Id.*

38. *See Ex parte Sosa*, 364 S.W.3d 889, 892 (Tex.Crim.App.2012).

39. Tellingly, the trial judge also explicitly found, in her finding No. 176, that "even absent the testimony and evidence elicited from Dr. George Denkowski during habeas proceedings, the applicant fails to show by a preponderance of the evidence that he meets the three-prong definition of mental retardation and fails by a preponderance of the evidence to prove mental retardation."

40. "The Flynn Effect" is the name given to the tendency of IQ test scores to rise over time in the years after a particular I.Q. test

has been devised and normed for one specific cohort. It is generally attributed to normal educational advances and increasing sophistication.of the test-taking populace over time. It is not that individual test takers are necessarily smarter than those who took the test shortly after it was developed, but rather that the questions themselves are less intellectually demanding to each succeeding cohort of test-takers. *See generally,* James R. Flynn, *Tethering the Elephant, Capital Cases, IQ and the Flynn Effect,* 12 PSYCH. PUB. POLY. & L. 170 (2006). We have not addressed the scientific validity of "The Flynn Effect" and need not do so in this case.

41. This was applicant's highest score and is consistent with his remarkable recall of detail from the various robberies he had committed in 1986.

sub-average." Although the Woodcock–Johnson test is not a true IQ test and should not be considered in a vacuum, the judge was not precluded from considering it as having some probative value on the question of "significant subaverage intellectual functioning."

The judge also noted that evidence at the *Atkins* hearing showed that, at age 11, applicant was referred for a special-education assessment by Ms. Strozier, one of his teachers. Although she could not recall the specific reason for the referral,[42] "it would not have been something she would have gone into lightly because it required a lot of paperwork." After Applicant obtained an 80 on the WISC, however, he was not placed in special education classes. Applicant's school records showed that he received all B's in the fourth grade and all C's in the fifth grade. His elementary teachers gave him high marks for "responsibility" and "initiative." However, by middle and high school, applicant started to receive very low marks for "responsibility" and "initiative." His grades fell, and he received mainly C's and D's in the seventh through eleventh

grades. It was also during this time that applicant began drinking and using drugs. The trial judge found that these habits affected applicant's academic performance.

Several of applicant's former school friends testified at the *Atkins* hearing that applicant put forth little effort in class, that he "would not discuss the work or participate in class," and that he did not do his homework. There were special education classes in the school district, but applicant was not in them.[43]

Based upon this record, the trial judge could have concluded that applicant had significant subaverage intellectual functioning before the age of eighteen. She did not. Because the trial judge personally saw the witnesses and evaluated their demeanor and credibility,[44] I accept her ultimate factual finding: Applicant did not have significant subaverage intellectual functioning before the age of eighteen. That finding is supported by the record, and while a different factfinder might have concluded otherwise, such speculation is just that—speculation.[45]

---

42. There was a notation of "educable mentally retarded" on one school record, but there is no explanation as to who made that entry or the basis for it. An IQ score of 80 is well above what one would classify as "educable mental retarded," which is the former term for "mild mental retardation" and is characterized by an IQ score between 50 or 55 to 70. *See* DSM–IV Sourcebook 155 (1997); RANDOLPH P. SCHIFFER ET AL., NEUROPSYCHIATRY 553 ("Mild MR (coded 317 in DSM–IV) is diagnosed when IQ is in the range from 55 to 69. These individuals sometimes have been referred to as the educable mentally retarded.").

43. One of applicant's former friends, who became an educator, testified at the *Atkins* hearing that she would have referred applicant for testing based upon his poor school work.

44. *See Ex parte Reed*, 271 S.W.3d 698, 727 (Tex.Crim.App.2008); *see also Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex.Crim.App.

2012); *Ex parte Miller*, 330 S.W.3d 610, 617 (Tex.Crim.App.2009).

45. *See Ex parte Lewis*, 223 S.W.3d 372, 378 (Tex.Crim.App.2006) (Cochran, J., concurring statement) ("[W]hile there is significant expert opinion testimony, documentary materials, and lay testimony in this record that might support a finding of mental retardation, there is also sufficient evidence, including expert and lay opinion testimony, as well as written records, to support the trial court's finding that applicant failed to prove that he is mentally retarded. In such a situation, I defer to the trial court's credibility determinations and ... adopt its ultimate findings of fact. Based on those findings and my independent review, I agree with the Court's decision to deny relief.").

## B. Adaptive Deficits.

Assessing adaptive deficits in a retrospective *Atkins* hearing is an extremely difficult task. First, there is a tremendous incentive for those closest to the defendant to remember him as being deficient. Because a finding of mental retardation will prevent imposition of a death sentence, it is understandable that those who wish to spare the defendant's life recall and focus on previously unnoted deficits or downplay competencies, consciously or otherwise. Second, the guidelines for assessing adaptive deficits are so vague and subjective that beauty frequently is in the eye of the beholder. In the context of *Atkins* hearings, experts routinely disagree about which behaviors to focus on and what significance different behaviors have.

In reference to the first problem, which might be called "secondary gain" or the unconscious exaggeration of symptoms of mental retardation for the understandable purpose of derailing a death sentence, the judge discounted the testimony of applicant's friends and family members at the *Atkins* hearing and did not give great weight to applicant's experts concerning adaptive deficits. For example, Dr. Keyes, one of applicant's experts, administered the Vineland Adaptive Behavior Scales to two of applicant's closest childhood friends. Their 2006 memories of applicant's childhood behavior some twenty-five to thirty years earlier resulted in a composite test score of 39 when the average would be 100. Even Dr. Keyes agreed

that these scores were "spuriously low." [46] Dr. Keyes also dismissed the 1988 trial testimony of applicant's father (and presumably that of his other family and friends) as looking through "[r]ose-colored glasses" and concluded that applicant's father "probably didn't know his son very well."

As the federal district judge noted in his review of the *Atkins* hearing, "Although Dr. Keyes was qualified as an expert by education and experience, the adversarial slant to his testimony gave the state trial judge ample reasons to reject many of his conclusions." [47] The trial judge would have been entirely within her discretion to conclude that this same, perhaps unconscious, slant affected the 2006 testimony of applicant's friends and family members. She stated, "The Court finds unpersuasive, and, at times, contradictory, the 2006 writ hearing testimony of the applicant's family/friends offered in an attempt to show mental retardation." She also found that, during his youth, "applicant was neither considered nor treated as mentally retarded, notwithstanding any academic deficiencies." We normally do not reweigh the evidence or second guess the credibility determinations of the trial judge. [48]

Turning to the second difficulty, that of objectively assessing the defendant's adaptive behavior and abilities, experts, friends, and family may once again reasonably disagree on which behaviors matter and what those behaviors demonstrate. It was partly for this reason that we adopted the *Briseno* factors to assist the factfin-

---

46. Applicant argues that, while the Vineland test results may not be reliable, the trial judge had no basis to reject the information provided by applicant's childhood friends. But the trial judge could reject that information for the same reason that a jury may reject the alibi testimony of the defendant's mother. She is, after all, the defendant's mother.

47. *Butler*, 576 F.Supp.2d at 824.

48. *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim.App.2008) ("Uniquely situated to observe the demeanor of witnesses first-hand, the trial judge is in the best position to assess the credibility of witnesses. Therefore, in most circumstances, we will defer to and accept a trial judge's findings of fact and conclusions of law when they are supported by the record.") (footnote omitted).

der—both the trial judge and this Court in the context of habeas cases [49]—in considering pre-existing objective data that has not been collected for the sole purposes of deciding the question of mental retardation in the context of an *Atkins* hearing. Those factors focus on the defendant's behavior and competency in "the real world" before people are seeking specific evidence for (or against) a finding of mental retardation that would bar the defendant's execution.[50]

In this case, the trial judge could rely, in part, upon applicant's remarkably competent crime-spree behavior. This was behavior that was well-documented by both applicant and the various crime victims.[51] Did this conduct paint the portrait of a mentally retarded person? Applicant was a professional robber. There were no deficiencies in his ability to understand or process information during his numerous armed robberies, murders, and rapes. He "cased" his stores before robbing the

**49.** *Id.* ("For over forty years, our writ jurisprudence has consistently recognized that this Court is the ultimate factfinder in habeas corpus proceedings. The trial judge on habeas is the ' "original factfinder." ' ") (footnote omitted).

**50.** One of those factors is whether "those who knew the person best during the developmental stage—his family, friends, teachers, employers, and authorities—think he was mentally retarded *at that time*, and, if so, did they act in accordance with that determination?" That is, what contemporaneous documentation, from the person's childhood and youth, is there to support a finding that, long before any death penalty issue arose, those who knew the person thought and acted as if the person was mentally "slow." The issue is not whether the defendant's family *now*, at an *Atkins* hearing, can recall examples of past deficiencies.

**51.** Applicant refers to a paragraph from the AAMR/AAID *User's Guide* that states

Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior or about having MR/ID. Greenspan and Switzky (in press) discuss two reasons for this guideline. First, there is not enough available information; second, there is a lack of normative information.

Greenspan and Switzky have elaborated on this concern in their chapter on *Lessons From the Atkins Decision:*

There are two reasons why one should avoid basing diagnostic inferences about a defendant's level of adaptive functioning, and about having MR, on information about his or her past criminal acts. The first reason has to do with the fact that not enough information is typically available

(on a precise microlevel) regarding the exact situational demands and the level of cognitive skills required to navigate those demands. Among the situational factors we do not typically know about is the extent to which the defendant may have been coached and trained by a less impaired "robbery coach," as opposed to figuring out these things for himself. The second reason is that we simply do not possess normative information, adaptive behavior scales notwithstanding, about whether someone with MR can fire a gun, drive a car, case out a crime scene, or assert his will on victims. One of the lessons of the "support revolution" is that people with MR can do many things, including aspects of work and independent living, that previously one would not have thought they could do. Without meaning to be flip, one can think of a crime as a form of work. Just as people with mild MR have been found able to do jobs that previously might have been viewed as beyond their capabilities, it is possible that people with mild MR have a greater potential for a successful criminal career than might previously have been believed possible.

H.N. Switzky & S. Greenspan, WHAT IS MENTAL RETARDATION? IDEAS FOR AN EVOLVING DISABILITY IN THE 21ST CENTURY 288 (2006).

In this case, the necessary "microlevel" information is available, and the situational factors are well-known. As for the second, "normative" concern, applicant's criminal career can fairly be characterized as not just competent but remarkably astute. At any rate, while clinicians might not use such behaviors in their diagnostic analysis, factfinders in the judicial system are not precluded from doing so.

clerks. He parked his car out of sight so that his victims could not identify it. He never committed a robbery when there were other customers or clerks in the store. He killed only clerks who refused to obey him. He wounded one clerk who "dissed" him. He raped two young and attractive female clerks by threatening to kill them and by pointing his gun at their heads to force them to perform oral sex on him. He shot at a deputy sheriff who tried to arrest him. In his various written confessions, applicant had perfect recall of even minor details, including the clothes that he was wearing during each of his many robberies. Those crimes also show that he was not acting under the influence of some other, dominant personality. His was a one-man show, acting alone and keeping his exploits to himself. He saved newspaper articles about his robberies.

Applicant was able to "abstract from mistakes and learn from experience." He took the license plate off his Buick and stole another plate to replace it after he heard on TV that a witness had obtained his license plate number when applicant escaped from the capital murder at the cleaners. Applicant showed no deficit in logical reasoning when he developed a remarkably successful scheme to commit a lengthy series of aggravated robberies. Applicant was caught only because a deputy sheriff fortuitously stopped to investigate what he thought was an "abandoned" car and discovered that the license plate was stolen. Even then, applicant was quick-witted and managed to stall the deputy while he maneuvered around the side of his car to use it as a shield before shooting at the deputy, then fled across the highway to steal a pick-up truck from another convenience-store clerk. This is a

man with steely presence of mind. When he realized that the jig was up and he would be caught by the pursuing patrol cars, he jettisoned his .38 Special out the passenger window.

As for applicant's communication skills, the trial judge noted that applicant had testified coherently, chronologically, and in great detail at his earlier trial for the Chambers County aggravated sexual assault. The trial judge found that he "was able to effectively communicate; that he responded logically and appropriately to questions; that the applicant understood the questions being asked of him; and, that applicant was able to devise a story of mistaken identity and police coercion to obviate his guilt." Applicant's expert, Dr. Keyes, discounted this ability by suggesting "that he had been very carefully coached on what to say" or that these events constituted "a particularly dramatic moment in his life" and therefore his memory, reasoning, and communication skills during that testimony were enhanced.[52] Another expert testified that applicant's testimony in that trial was not grammatically sophisticated and that his vocabulary was comparable to the complexity of a language-impaired child of eight or ten. The trial judge could have accepted those explanations, but she was not required to do so. Based on applicant's trial testimony and his confessions, the trial judge concluded that "applicant demonstrated an ability to understand questioning, to respond coherently and rationally, to sequence events, and to communicate."

Even during the 2006 writ hearing, applicant's father, although admitting that applicant got bad grades in school, testified to his various social, work, and communication skills during his formative

---

**52.** The trial judge explicitly found "unpersuasive Dr. Keyes' assertion that the applicant possesses deficits in adaptive behavior."

years. He stated that applicant was a good driver and had had a car since he was 16 or 17; applicant understood and obeyed traffic rules. He was active in the community and would run errands for elderly people, such as going to the grocery store, mowing lawns, and raking leaves. Applicant was able to remember items he needed to purchase and could read a grocery list. Applicant could use a gas lawn mower and was paid for his work. Finally, applicant's father had no concerns about his son moving away and caring for himself.

Anthony Minor testified that he met applicant in junior high and that, while he had a limited vocabulary, he was "an average kid." At Mr. Minor's suggestion, applicant moved to Houston and stayed with Mr. Minor for three to four months. Mr. Minor got tired of applicant's messy habits, so he helped him find his own apartment, buy his own car, and fill out a job application with AMF Tubascope doing physical labor. Applicant saved his own money to buy his car, and he had a driver's license. Mr. Minor thought applicant could live on his own without trouble.

The trial judge also noted that applicant completed basic training in the Army National Guard in 1982. He "was trained in the use of an M–16 rifle and hand grenades[.]" He was required to listen to instructions and follow them in "learning how to fire, clean, assemble and dissemble a firearm, keeping one's uniform orderly, and keeping one's bunk area clean and neat." Applicant had written a "coherent note" to his commanding officer explaining why he had missed duty, explaining that he had to baby-sit his nephew, and recognizing that he was wrong for missing drill.

The trial judge pointed to objective evidence in applicant's prison cell that would support a finding that applicant had normal reading and writing skills as well as logical and rational thinking skills: a newspaper article entitled "Penry Sentencing Trial Focuses on Mental History, Child Abuse"; ten issues of *Slam* magazine, three issues of *ESPN*, one issue of *Men's Journal*, and one issue of *Sporting News*, all of which were specifically addressed to him. Applicant also had numerous books, pamphlets, and newsletters, including Biblical materials, *The Echo*, *The Death Row Journal*, and *The Texas Coalition to Abolish the Death Penalty*. He had completed TDCJ–ID commissary order slips, Inmate Trust Fund Account information, and numerous photos and correspondence. He also kept various health and self-care items in his cell, including a toothbrush, toilet tissue, Speed Stick deodorant, a hairbrush, AmerFresh Balsam & Protein Shampoo, Colgate toothpaste, Blue Duchess hair pomade, Texas Star Cocoa Butter Lotion, and Dial soap. The trial judge found that "applicant's commissary order slips show that applicant ordered numerous items from the prison commissary; that applicant did not exceed the limit and/or overdraw his trust fund account; and, that one commissary order slip reflects that applicant ordered, in part, 24 soft drinks—root beer at 40 cents each for a total of $9.60, 5 1 oz. Bars of soap at 15 cents each for a total of 75 cents, and two cheese puffs at 95 cents each for a total of $1.90." This is some evidence that applicant can itemize, add, and multiply.

The trial judge also referred to TDCJ health records, which showed that applicant was "functioning at an average intellectual level; that applicant was able to explain the meaning of proverbs, such as '[b]irds of a feather flock together;' and that applicant was administered the MMPI–2, resulting in an invalid profile suggesting that the applicant was 'overendorsing' symptoms of mental disorders." His health records consistently showed

that "applicant's speech and thought processes are normal, and the applicant is of normal intelligence."

Applicant argues that the trial judge was wrong to rely upon objective examples of applicant's strengths, competencies, and skills. Instead, he argues, we should focus on evidence of limitations and deficiencies.[53] Were applicant's methodology required, then any evidence of a purported limitation would prevent the factfinder from balancing that evidence against evidence of competency in that particular area. Such is not the law.[54] Instead, in making her determination, the trial judge used "the proper methodology of examining *all evidence* pertaining to a possible deficit in adaptive behavior," including evidence of applicant's "strengths that clearly rebutted allegations of his limitations." [55]

## IV.

The trial judge was entitled to, and did, consider objective data and information that was not filtered through, as Dr. Keyes put it, the "rose-colored glasses" of family, friends, or experts who might have consciously or unconsciously slanted their testimony and opinions in an understandable effort to protect applicant from a death sentence. Although there is evidence from which one could infer applicant did have intellectual and adaptive deficits, there is also ample evidence in the record—excluding any reference to Dr. Denkowski and his analyses or opinions—to support the trial judge's ultimate factual conclusion that applicant did not prove that he was mentally retarded.[56] Because the record supports the trial judge's determination, I agree that we must deny relief on applicant's claim.

PRICE, J., filed a dissenting statement in which JOHNSON, J., joined.

On June 27, 2007, we denied post-conviction habeas corpus relief to this applicant,[1] rejecting his *Atkins* claim that he cannot be executed consonant with the Eighth Amendment because he is mentally retarded.[2] Without explicitly adopting the recommended findings of fact and conclusions of law of the convicting court, we nevertheless agreed with the lower court that the application should be denied on the merits, and we did so without further comment.[3] The applicant filed a federal petition for writ of habeas corpus in federal district court. That court, in a published opinion, rejected the applicant's challenge to our judgment in the state habeas proceedings,

---

53. Applicant argues that the trial judge's methodology, "finding some islands of skill in the relative sea of Mr. Butler's limitations in a domain of adaptive behavior and ignoring the sea—reflects the court's invalid and inaccurate frame of reference." Applicant's Objections to the District Court's Proposed Findings, at 30.

54. *See Dufour v. State,* 69 So.3d 235, 249–50 (Fla.2011) (rejecting view that courts, in *Atkins* hearing, must focus only on limitations in evaluating adaptive behavior).

55. *Id.*

56. *See Ex parte Lewis,* 223 S.W.3d 372, 378 (Tex.Crim.App.2006) (Cochran, J., concurring statement).

1. *Ex parte Butler,* No. WR–41,121–02, 2007 WL 1847377 (Tex.Crim.App., delivered June 27, 2007) (not designated for publication).

2. *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

3. *See Ex parte Butler, supra,* at *1 ("The trial court held a hearing and made findings of fact and conclusions of law recommending that this application be denied because Applicant has failed to show that he is mentally retarded. We have reviewed the record of the hearing and the trial court's findings of fact and conclusions of law and agree that this application should be denied.")

under the highly deferential criteria of the Antiterrorism and Effective Death Penalty Act [AEDPA], but was sufficiently troubled to grant the applicant a certificate of appealability to the Fifth Circuit.[4]

The State's expert at the *Atkins* state habeas writ hearing was Dr. George Denkowski, a licensed psychologist with experience in diagnosis and treatment of mental retardation. It was largely on the basis of Dr. Denkowski's input that the convicting court was able to recommend finding against the applicant with respect to all three of the diagnostic criteria for mental retardation: general intellectual functioning, adaptive functioning, and onset before age 18.[5] Although we did not adopt those findings, this Court's summary rejection of the applicant's *Atkins* claim was surely based in equal measure on Denkowski's testimony because, without it, it is fairly clear that the applicant presented evidence that would have established mental retardation at least by a preponderance of the evidence. At the evidentiary hearing, the applicant presented ample evidence, including expert testimony, that would have served to establish all three prongs of the diagnostic criteria. Having reviewed the transcript of the 2006 eviden-

tiary hearing, I, for one, would readily have found that the applicant demonstrated mental retardation to the requisite level of confidence—but for Denkowski's rebuttal testimony.[6]

Since we rejected the applicant's *Atkins* claim in 2007, Denkowski's diagnostic practices have come under considerable professional scrutiny. In April of last year, he entered into a settlement agreement, in proceedings that were brought against him by the Texas State Board of Examiners of Psychologists with the State Office of Administrative Hearings, in which he agreed to discontinue forensic evaluations for mental retardation in *Atkins* cases.[7] The applicant subsequently persuaded the Fifth Circuit to stay his appeal of the federal district court's denial of his federal habeas petition to allow him to seek reconsideration in this Court of the denial of relief in view of the settlement agreement. While the Texas Rules of Appellate Procedure do not contemplate the filing of a motion for rehearing following the denial of a post-conviction application for writ of habeas corpus,[8] we are authorized, and on occasion have exercised our authority, to revisit final judgments in such matters, on our own motion, under extraordinary cir-

---

4. *Butler v. Quarterman*, 576 F.Supp.2d 805, 816–17 (S.D.Tex.2008).

5. *E.g.*, *Ex parte Hearn*, 310 S.W.3d 424, 428 (Tex.Crim.App.2010).

6. In the context of post-conviction habeas corpus, the convicting court is the "original" fact-finder, and we ordinarily pay great deference to that court's findings of fact and conclusions of law when supported by the record. But that deference is not boundless, and we do not simply rubber-stamp the convicting court's recommendations. This Court is the "ultimate" fact-finder, with the prerogative to reject the convicting court's recommendations on those rare occasions when we deem it appropriate, even when they are supported by the record, if we think another disposition

is manifestly *better* supported by the record. *Ex parte Spencer*, 337 S.W.3d 869, 879–80 n. 1 (Tex.Crim.App.2011) (Price, J., concurring); *Ex parte Robbins*, 360 S.W.3d 446, 467 n. 14 (Tex.Crim.App.2011) (Price, J., concurring).

7. *See Maldonado v. Thaler*, 625 F.3d 229, 234 (5th Cir.2010) (noting the proceedings brought against Denkowski in the State Office of Administrative Hearings); *Pierce v. Thaler*, 604 F.3d 197, 213 (5th Cir.2010) (noting that this Court had recently found Denkowski's credibility to be lacking in *Ex parte Plata*, No. AP–75,820, 2008 WL 151296 (Tex.Crim.App., delivered Jan. 16, 2008) (not designated for publication)).

8. Tex.R.App. P. 79.2(d).

cumstances.[9] We did so in this case, remanding the cause to the convicting court "to allow it the opportunity to re-evaluate its initial findings, conclusions, and recommendation in light of the Denkowski Settlement Agreement."[10]

The convicting court has apparently refused to avail itself of this opportunity. Our remand order invited the convicting court to "order affidavits or hold a live hearing if warranted."[11] Accordingly, the applicant offered new affidavits and requested a hearing. The convicting court made no ruling on these matters. According to the applicant (although we have no official record of it), the convicting court simply announced from the bench that it would not "reconsider its *Atkins* ruling."[12] Instead, the convicting court "directed the District Attorney to submit a new set of proposed findings of fact and conclusions of law."[13] Apparently, the convicting court did not invite the applicant to do the same.[14] The convicting court then signed the State's Proposed Findings of Fact and Conclusions of Law

on Remand "without a single change."[15] Noting that the Denkowski settlement agreement "does not contain a finding that Dr. Denkowski improperly evaluated the applicant for mental retardation[,]" the recommended findings and conclusions on remand make reference to the settlement agreement "only for historical background of the applicant's case and . . . not . . . for purpose of relitigating the issue of the applicant's claim of mental retardation." Otherwise, what we have now received is an only-slightly-reworked version of the original forty-eight page recommended findings of fact and conclusions of law that we refused to adopt back in 2007. At practically every point in the original findings of fact at which the convicting court had previously made a recommended finding expressly "based on Dr. Denkowski's credible affidavit," the recommended findings of fact on remand now simply delete the word "credible."[16] What are we to make of this? Does the convicting court now recommend that we once again make these numerous specific findings of fact on the basis of Denkow-

9. *Ex parte Moreno*, 245 S.W.3d 419, 427–29 (Tex.Crim.App.2008).

10. *Ex parte Butler*, No. WR–41,121–02, 2011 WL 6288411, at *1 (Tex.Crim.App., delivered Dec. 14, 2011) (not designated for publication).

11. *Id.*

12. Applicant's Objections to the District Court's Proposed Findings of Fact and Conclusions of Law (hereinafter "Objections") at 1.

13. *Id.* at 2.

14. Under Article 11.071, Sections 8 and 9, both parties "shall" file proposed findings of fact and conclusions of law for the convicting court to consider. Tex.Code Crim. Proc art. 11.071, §§ 8(b) & 9(e). *See Jefferson v. Upton*, 560 U.S. 284, 130 S.Ct. 2217, 2223, 176 L.Ed.2d 1032 (2010) ("Although we have stat-

ed that a court's verbatim adoption of findings of fact prepared by prevailing parties should be treated as findings of the court, we have also criticized that practice." (citation and internal quotation marks omitted)).

15. Objections at 2.

16. By my count, there are nineteen specific findings of fact that the convicting court originally recommended we make based on "the credible affidavit of Dr. Denkowski" that it now recommends we make based simply on "the affidavit of Dr. Denkowski[.]" In addition, two of the convicting court's originally recommended conclusions of law with respect to the first prong of the diagnostic criteria for mental retardation (general intellectual functioning) were based on, *inter alia*, "the credible affidavit of Dr. Denkowski[.]" The convicting court continues to recommend these conclusions of law to us, but has altogether removed any reference to Denkowski's affidavit.

ski's affidavit—even though the convicting court apparently no longer recommends that we regard that affidavit as "credible"? Beyond these amendments, the convicting court has done little more than to add a phrase toward the end of its recommended findings of fact by which it proposes that we find that the applicant has failed to establish the three diagnostic criteria for mental retardation "even absent the testimony and evidence elicited from Dr. George Denkowski during the habeas proceedings[.]" Neither the amendments themselves nor the process by which they were made inspire confidence.

**General Intellectual Functioning:** With respect to the first prong of the diagnostic criteria for mental retardation, Denkowski persuaded the convicting court that the results of several IQ tests, including one that he himself had conducted,[17] should be discounted in favor of an IQ test conducted when the applicant was a teenager that reaped an IQ score of 80, less than two standard deviations below the mean of 100. Contrary to the testimony of the applicant's experts, Denkowski maintained that even application of the so-called "Flynn Effect" would not lower this particular score to below two standard deviations below the mean, disagreeing with the applicant's experts (and, apparently, with diagnostic convention) with respect to the precise numerical reduction that ought to apply (.13 of a point per year, as opposed to .3, times the number of years since the particular testing instrument was last normed). The convicting court now recommends that we find that "neither the Fifth Circuit Court of Appeals nor" this Court has "recognized the Flynn Effect as

scientifically valid." But neither has this Court *rejected* the validity of the Flynn Effect and, like the federal district court, we are therefore "left with the evidentiary record in this case."[18] Here, all of the experts, including Denkowski, acknowledged the diagnostic legitimacy of the Flynn Effect, disagreeing only with respect to how it should apply to adjust the applicant's scores. As the federal district court observed, "[o]n this point the literature did not support Dr. Denkowski's reduced discount factor," and did support that of the applicant's experts.[19]

Denkowski also convinced the convicting court that the applicant's score on a certain achievement test indicated that the higher IQ score of 80 was the more reliable, despite testimony from the applicant's experts that the data support a judgment that individuals with IQ scores in the mild mental retardation range are capable of comparatively high scores on achievement tests and that there is no direct correlation between IQ scores and achievement test scores. Finally, he convinced the convicting court—again, against convention, if the applicant's experts are to be credited—that the best measure of IQ is not always the full-scale IQ score at all, but may instead be something called the Perceptual Organization Index, which is apparently a sub-test of the WAIS–III IQ test that Denkowski himself had administered to the applicant to obtain a full-scale IQ score of 69. In *Ex parte Hearn*, we held that the kind of clinical judgment that Denkowski seems to have utilized to inflate the applicant's IQ cannot serve "as a replacement for full-scale IQ scores in meas-

---

17. Denkowski administered the Wechsler Adult Intelligence Scale, 3rd edition (WAIS–III) to the applicant in 2006, obtaining a full-scale IQ score of 69.

18. *Butler v. Quarterman, supra*, at 814.

19. *Id.* at 814–15.

uring intellectual functioning." [20]

The federal district court was clearly troubled by the convicting court's reliance on Denkowski's "heavily disputed opinions." [21] It deferred to those opinions only because Denkowski was, after all, "qualified as an expert in mental retardation," and because the applicant had not satisfied the onerous burden to refute his opinions by clear and convincing evidence as required by the AEDPA. [22] That Denkowski has agreed to discontinue his *Atkins* assessments in light of the many professional complaints that have been lodged against him suggests to me that we ought to discount the convicting court's new recommended findings of fact and conclusions of law with respect to the applicant's general intellectual functioning precisely to the extent that they continue to rely, explicitly or implicitly, on Denkowski's "heavily disputed opinions." [23]

**Adaptive Deficits:** The same may be said for the convicting court's reliance on Denkowski's testimony with respect to the second prong of the diagnostic criteria for mental retardation, adaptive deficits. There are at least two aspects of Denkowski's input with respect to adaptive deficits that we should reject outright. First, the convicting court found that two of the standardized instruments that were utilized in this case—one by the applicant's main expert and the other by Denkowski himself—should not be taken into account because they are not normed for the long-term incarcerated such as the applicant. That left only the Vineland Adaptive Behavior Scales. [24] This instrument was administered by the applicant's expert to yield a composite score of 39, with the mean being 100. [25] The convicting court discounted this score, however, on the basis of Denkowski's assurances that a score this low would indicate an individual with profound mental retardation, which the applicant clearly is not. [26] In accepting Denkowski's judgment in this regard, the convicting court flatly ignored testimony from several of the applicant's experts to the effect that the Vineland is a very good instrument for discriminating those with borderline adaptive abilities from those

**20.** 310 S.W.3d at 431.

**21.** *Butler v. Quarterman, supra,* at 816.

**22.** *Id.*

**23.** *Id.*

**24.** In *Ex parte Briseno,* we acknowledged that adaptive behavior should be measured "by clinical assessment and, usually, standardized scales." 135 S.W.3d 1, 7 n. 25 (Tex.Crim. App.2004) (quoting American Association on Mental Deficiency (AAMD), Classification in Mental Retardation 1, 11 (Grossman ed.1983)). The Vineland is one of the accepted scales. American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 42 (4th ed.2000).

**25.** A significant limitation in adaptive functioning may be "defined by a score of at least two standard deviations below either (1) the mean in one of the three adaptive behavior skills areas or (2) the overall score on a standardized measure of conceptual, social, and practical skills." *Ex parte Hearn, supra,* at 428.

**26.** In its finding of fact number 157 on remand, the convicting court continues to find "that the applicant's score of 39 is equivalent to an IQ score of 39[.]" Going to the particular page of the habeas hearing record to which the convicting court cites, however, I find that Denkowski made no such assertion. Instead, he simply said that a composite score of 39 on the Vineland should be "interpreted just like an IQ score." By this I take Denkowski simply to mean that, in scoring the Vineland, the mean is 100 (just as the mean in an IQ test is 100), such that a score of 39 would fall more than four standard deviations below the mean—hence, the basis for agreement among all of the experts at the applicant's writ hearing that it was a very low score.

with at least mild mental retardation, but that it has far less power to distinguish between levels of mental retardation itself. The applicant's main expert readily conceded that the applicant's score of 39 was "probably a little too low," but he nevertheless believed it to be a more than reliable indication that the applicant had at least two areas of significant adaptive deficits. A second of the applicant's experts readily agreed. We should reject the convicting court's recommendation to credit Denkowski's testimony over that of the applicant's experts in the wake of the subsequent controversy surrounding Denkowski's diagnostic practices.

Second, also with respect to the second prong, the convicting court expressly credited Denkowski's testimony that evidence of *criminal* adaptability may properly be taken into account in arriving at an ultimate clinical judgment with respect to adaptive deficits. But, according to the applicant's experts, this is decidedly *not* the conventional view. In any event, in rejecting the applicant's substantial evidence of adaptive deficits, both Denkowski and the convicting court focused inordinately on the applicant's relative *strengths* rather than ruling out manifest weaknesses in at least two adaptive skills areas. As I argued two years ago, albeit in an unpublished dissent, this emphasis on adaptive strengths rather than adaptive weaknesses runs contrary to standard diagnostic protocol, which I believe the courts are obliged to follow in implementing *Atkins*.[27]

**Onset Before 18:** As for the third prong, onset before age 18, the convicting court simply concluded that, because the applicant could not establish either of the first two prongs *at all*, he had obviously failed to establish *timely* onset. By definition, this conclusion with respect to the third prong is every bit as suspect as the convicting court's conclusions with respect to the first two.

The evidence that remains after discounting Denkowski's influence convinces me that the applicant has established all three of the diagnostic criteria for mental retardation by a preponderance of the evidence and cannot constitutionally be executed under *Atkins*. Under these circumstances, I do not believe that the State's usual weighty interest in the repose and finality of its verdicts is sufficiently compelling to overcome the Eighth Amendment's aversion to executing a mentally retarded offender.[28] With the controversy surrounding Denkowski's forensic methods, I do not think that, as the court of return and the ultimate arbiter of both the facts and the law in capital post-conviction habeas corpus proceedings, we can be sufficiently confident of our original judgment to allow it to stand. Nor can we rely on the federal courts to be our backstop—under the AEDPA, the federal courts are required to pay almost insurmountable deference to our credibility determinations.[29] The applicant will get no opportunity to present additional evidence in federal court.[30] I would reject the convicting

---

27. *See Lizcano v. State,* No. AP–75,879, 2010 WL 1817772, at *37 (Tex.Crim.App., delivered May 5, 2010) (Price, J., joined by Johnson & Holcomb, JJ., concurring and dissenting) (not designated for publication) (the presence of strengths in one or more adaptive skills areas does not counter-indicate mental retardation so long as weaknesses are identified in at least two others).

28. *Ex parte Moreno, supra,* at 429.

29. *See* 28 U.S.C. § 2254(d)(2) (federal habeas petition "shall not be granted" unless state court adjudication of the claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding").

30. *Cullen v. Pinholster,* —— U.S. ——, 131 S.Ct. 1388, 1401, 179 L.Ed.2d 557 (2011).

court's recommended findings of fact and conclusions of law as insupportable and instead find that the applicant has satisfied his burden to establish that he is a person suffering mental retardation and is therefore immune from execution under the Eighth Amendment. Failing that, if the Court is determined to pay deference to the convicting court's recommendations, we should at least take up the applicant's suggestion that we remand the case once again to the convicting court for a more searching reevaluation than it conducted on the original remand. Because the Court does neither, I respectfully dissent.