**IN RE Tyrone ALLEN, Relator**

**NOS. WR–82,265–01 & WR–82,265–02**

Court of Criminal Appeals of Texas.

DELIVERED: May 13, 2015

Theodore A. Beach, Bradley K. Lollar, Christina Thompson Déan, for Applicant.

## OPINION

Keasler, J., delivered the opinion of the Court in which Meyers, Hervey, Richardson, and Yeary, JJ., joined.

In two capital-murder cases, Tyrone Allen sought a pretrial hearing requesting the trial judge determine whether he was intellectually disabled and therefore exempt from the death penalty if convicted. Over the State's objection, the judge granted the motions for a pretrial hearing. The court of appeals granted the State mandamus relief, finding that the judge acted outside his authority. The uncertainty surrounding intellectual-disability determinations prevents labeling the judge's actions a violation of a ministerial duty. We conditionally grant Allen's petitions for writ of mandamus to the court of appeals.

## Trial Court

Allen faces two capital-murder indictments and the possibility of death sentences in each. Allen filed a motion requesting a pretrial determination by the trial judge on his intellectual disability alleging facts supporting his claim that he suffered from intellectual disability and was therefore exempt from execution. After holding a hearing on Allen's request, the judge granted Allen's motion. At this juncture, the judge has not yet held the hearing or made an intellectual-disability determination in either case. The State sought mandamus relief in this Court, but the State's motion for leave to file a petition for writ of mandamus was denied.[1] The State subsequently sought and obtained mandamus relief in the Dallas Court of Appeals.[2] This Court granted Allen's motion for leave to file a petition for writ of mandamus challenging the court of appeals' judgment.

## Court of Appeals

Although noting the absence of established procedures for addressing intellectual-disability issues in capital cases, the court of appeals found the law sufficiently clear to hold that the judge acted without authority to grant Allen's request.[3] The court's analysis began by looking to this Court's previous cases stating that a finding of intellectual disability is an issue of fact. The court of appeals then looked to the following statutes found in the Texas

Code of Criminal Procedure: (1) Article 37.071, § 2, stating that once a jury finds a capital defendant guilty, the court must conduct a sentencing proceeding "before the trial jury"; (2) Articles 1.13(a) and 1.14(a), providing that a defendant facing the death penalty may not waive a jury trial on punishment; and (3) Article 36.13, mandating that "[u]nless otherwise provided in this Code, the jury is the exclusive judge of the facts."[4] The court concluded that, "Because intellectual disability is an issue of fact that is relevant to the determination of punishment, under Texas criminal procedure as it presently stands, the factual determination whether the defendant is intellectually disabled must be made by the jury that determines the guilt or innocence of the defendant."[5]

## Mandamus Standard

 Mandamus relief is appropriate only when a relator establishes (1) that he has no adequate remedy at law to redress his alleged harm, and (2) that what he seeks to compel is a ministerial act, not a discretionary or judicial decision.[6] A relator satisfies the ministerial-act component when he can show that he has a clear right to the relief sought.[7] "A clear right to relief is shown when the facts and circumstances dictate but one rational decision 'under unequivocal, well-settled (i.e., from extant statutory, constitutional, or case law sources), and clearly controlling legal principles.'"[8] A ministerial act, by its nature, does not involve the use of judicial discre-

---

1. *In re Craig Watkins*, Nos. WR–82,011–01 & WR–82,012–01 (Tex.Crim.App. Aug. 29, 2014).

2. *In re Craig Watkins*, Nos. 05–14–01167–CV & 05–14–01168–CV, 2014 WL 5903105 (Tex. App.—Dallas Oct. 3, 2014) (mem. op, not designated for publication).

3. *Id.* at *5–6.

4. *Id.* at *5.

5. *Id.*

6. *Bowen v. Carnes*, 343 S.W.3d 805, 810 (Tex. Crim.App.2011).

7. *In re State ex rel. Weeks*, 391 S.W.3d 117, 122 (Tex.Crim.App.2013).

8. *Id.* (citing *Bowen*, 343 S.W.3d at 810).

tion;[9] it must be positively commanded and so plainly prescribed under the law as to be free from doubt.[10] We have said that while a trial court has a ministerial duty to rule upon a properly filed and timely presented motion, it generally has no ministerial duty to rule a certain way on that motion.[11] It is proper to order a court to rule a particular way only when the law invoked is "definite, unambiguous, and unquestionably applies to the indisputable facts of the case."[12]

■ We review the court of appeals' judgment on a petition for writ of mandamus under a de novo review of the two-pronged test.[13] Because we find the mandamus standard's second prong dispositive in resolving the present case, we do not answer whether the State has an adequate remedy at law challenging the judge's ruling.

## No Clear Right to Relief

The State's assertion to the judge that "there is no express statute governing how intellectual disability is litigated" is undeniably true. However, we disagree with the court of appeals' conclusion that, when read together, several Code of Criminal Procedure articles unquestionably establish that Allen's pretrial motion compelled but one rational decision under unequivocal and well-settled legal principles: a denial.

We find little help in Article 37.071, § 2, which provides, in part, that upon finding a defendant guilty of capital murder in a case in which the State is seeking the death penalty, a separate punishment proceeding is required "before the trial jury" to determine whether the defendant shall be sentenced to death or life imprisonment.[14] The statute currently provides no statutory, procedural scheme defining how intellectual-disability issues should be handled. The court of appeals seizes on the "before the trial jury" phrase, but to consider that persuasive invites circular reasoning. Section 2 applies only when the "State seeks the death penalty." And if a trial judge finds a defendant exempt from the death penalty pretrial, presumably only the possibility of lifetime confinement remains.[15] Can we then say with any degree of confidence that the State is still seeking the death penalty at the moment a jury finds a defendant guilty of capital murder? If not, § 2 does not apply, and it would be illogical to use its language to support a conclusion that the judge in this case acted contrary to established law.

We also fail to find guidance on the present issue in Articles 1.13(a), 1.14(a), and 36.13. In the cases' current posture,

9. *Banales v. Court of Appeals for the Thirteenth Judicial Dist.*, 93 S.W.3d 33, 35 (Tex. Crim.App.2002); *State ex rel. Hill v. Court of Appeals for the Fifth Dist.*, 34 S.W.3d 924, 927 (Tex.Crim.App.2001).

10. *State ex rel. Hill*, 34 S.W.3d at 928.

11. *State ex rel. Young v. Sixth Judicial Dist. Court of Appeals*, 236 S.W.3d 207, 210 (Tex. Crim.App.2007).

12. *Id.*

13. *In re State ex rel. Weeks*, 391 S.W.3d at 121–22; *Bowen*, 343 S.W.3d at 810 n.6 ("The

State ... argues that it is the court of appeals's denial of mandamus relief that we should be reviewing rather than the respondent's ruling directly.... [I]n practice it makes little difference whether we purport to review the court of appeals's mandamus ruling or the trial court's order.... Either way, we review the appropriateness of the trial court's conduct.... essentially by undertaking a 'de novo application of the two pronged test' for mandamus relief.")

14. Tex.Code Crim. Proc. Ann. art. 37.071, § 2 (West 2011).

15. *See id.* § 1.

we find Articles 1.13(a) and 1.14(a), which limit a defendant's ability to waive a jury trial when the State seeks the death penalty, to be irrelevant. By considering these statutes supportive of its position, the court of appeals equates Allen's pretrial motion with a jury-trial waiver. In our minds, the proverbial dots remain unconnected, and therefore we do not share the court of appeals' confidence in the statutes' applicability to Allen's motion.

We further find no relevant mandate in Article 36.13's command that "[u]nless otherwise provided in this Code, the jury is the exclusive judge of the facts, but is bound to receive the law from the court and be governed thereby." The statute has been frequently cited to support the common notion that a jury decides facts, and the court applies the law to the facts.[16] It also supports the unremarkable legal principles that a jury is required to determine the elements of the offense in a jury trial and is the sole judge of the evidence's weight.[17] Whether the scope of this broadly worded statute encompasses Allen's request for a pretrial intellectual-disability determination is less clear. While an intellectual-disability determination is necessarily fact-intensive, our precedents addressing these determinations never invoked Article 36.13 as informative on the issue of the proper factfinder of intellectual disability.

## Case Law

Our case law provides only marginally more guidance than that found in existing statutes. In 2002, the United States Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment exempts intellectually disabled[18] criminals from the death penalty.[19] However, the Supreme Court left to the states the development of the substantive law and procedural mechanisms giving effect to its decision.[20] In *Ex parte Briseno*, this Court created a "stop-gap" definition of intellectual disability during a legislative interregnum to provide temporary judicial guidelines in addressing *Atkins* claims.[21] With a great deal of trepidation, we adopted a definition of intellectual disability and guidelines that, without subsequent legislative action, remain the law today despite the Court's intention that they be temporary.[22] Although Briseno's *Atkins* claim was presented in a post-conviction proceeding, *Briseno* recognized that *Atkins* itself does not require intellectual-disability determinations to be made by a jury.[23] Although a jury finding on

---

16. *See, e.g., Crabtree v. State,* 389 S.W.3d 820, 832–33 (Tex.Crim.App.2012) (distinguishing the factfinding duties of a jury from the lawgiving duties of a judge).

17. *See, e.g., Kirsch v. State,* 357 S.W.3d 645, 652 (Tex.Crim.App.2012) (holding that, in a driving-while-intoxicated trial, whether appellant was operating his motorcycle was a question of fact to be resolved by the jury); *Lancon v. State,* 253 S.W.3d 699, 705 (Tex.Crim.App.2008).

18. This opinion substitutes the term "intellectual disability" for "mental retardation." *See Hall v. Florida,* — U.S. —, 134 S.Ct. 1986, 1991, 188 L.Ed.2d 1007 (2014) ("Previous opinions of this Court have employed the term 'mental retardation.' This opinion uses the term 'intellectual disability' to describe the identical phenomenon."). *See also* Tex. Health & Safety Code Ann. § 591.003(7–a), (13) (West 2011).

19. *Atkins v. Virginia,* 536 U.S. 304, 318–21, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

20. *Id.* at 317, 122 S.Ct. 2242; *Ex parte Briseno,* 135 S.W.3d 1, 4–5 (Tex.Crim.App.2004).

21. *Briseno,* 135 S.W.3d at 4–5.

22. *Id.*

23. *Id.* at 10 ("There was certainly no indication from the Supreme Court in *Atkins* that

intellectual disability is not constitutionally required, we have endorsed, but have not mandated, the submission of a "special issue" on intellectual disability to the jury and held that submission to the jury sufficiently protects a defendant's Eight Amendment rights.[24]

Although not definitive, we find *Hunter v. State*,[25] a factually similar case to that at bar, to be the most informative authority on the present issue. The presiding judge of Hunter's capital-murder trial denied him a pretrial intellectual-disability determination by the judge, or in the alternative, a separately impaneled jury. *Hunter*'s analysis began by reprising *Briseno*'s admonishment: "Although a jury determined the issue of mental retardation in this case, it is important to note at the outset that a jury determination of mental retardation is not required."[26] Nor did *Briseno* address when a intellectual-disability determination is to be made.[27] The *Hunter* Court held that, because there is no legislation or constitutional requirement directing when or by whom an intellectual-disability determination is to be made, the judge did not err in denying Hunter's request.[28] *Hunter*'s rationale suggests, if only by implication, that the decision whether to grant a request to determine intellectual disability pretrial still encompasses a significant amount of judicial discretion.

It is suggested that our decisions in *State ex rel. Lykos v. Fine*[29] and *State ex rel. Watkins v. Creuzot*[30] support a conclusion that mandamus should issue.[31] Our holdings in these cases are not squarely on point. *Lykos* and *Fine* did not address real-party-in-interest intellectual-disability claims, but rather an "as applied" constitutionality claim to the death penalty itself and a claim asserting the delay of a retrial prevents the defendant from presenting a complete mitigation case, respectively. At a minimum, our opinion in *Hunter* muddies the water where intellectual-disability claims are concerned. Taking *Fine* and *Creuzot* into consideration with our other precedents, we do not find a denial of Allen's motion to be positively commanded and so plainly prescribed under the law as to be free from doubt.[32] Further, to find Allen's motion unjustiable for lack of ripeness pretrial ignores the immediate effect the State's notice in seeking the death penalty has upon the nature of the case. It affects a defendant's counsel's pretrial mitigation and punishment investigations, the appointment of punishment experts, voir dire proceedings, to list only a few implications of the State's notice. More importantly, we cannot conclude with the requisite certainty that these issues are too remote to consider the motion unripe.

■ If the law surrounding a court's action is unclear, mandamus relief may not

the fact of mental retardation is one that a jury, rather than a judge, must make.").

24. See, e.g., *Williams v. State*, 270 S.W.3d 112, 132 (Tex.Crim.App.2008); *Neal v. State*, 256 S.W.3d 264, 272 (Tex.Crim.App.2008); *Hunter v. State*, 243 S.W.3d 664, 671 (Tex.Crim. App.2007); *Gallo v. State*, 239 S.W.3d 757, 770 (Tex.Crim.App.2007); *Lizcano v. State*, No. AP–75,879, 2010 WL 1817772, *8–9 (Tex. Crim.App. May 5, 2010) (not designated for publication).

25. 243 S.W.3d at 672.

26. *Id.* at 667 (citing *Schriro v. Smith*, 546 U.S. 6, 7, 126 S.Ct. 7, 163 L.Ed.2d 6 (2005)).

27. *Id.* at 672.

28. *Id.*

29. 330 S.W.3d 904 (Tex.Crim.App.2011).

30. 352 S.W.3d 493 (Tex.Crim.App.2011).

31. *Post*, at 67 (Newell, J., dissenting).

32. See *State ex rel. Hill*, 34 S.W.3d at 928.

issue despite how unwise we think the action may have been. At times, it is an exercise akin to judicial restraint. The dissenters understand this opinion to modify the Legislature's procedural scheme in death-penalty cases[33] or that this Court judicially approves of deciding the intellectual-disability issue pretrial.[34] These conclusions stem from a misreading of this opinion, and they lose sight of the case's procedural posture. This case, like all mandamus cases, must be decided on the existing law alone. Unfortunately, we find none that supports a conclusion that granting Allen's request for a pretrial intellectual-disability determination deviated so far from well-settled legal principles to be considered acting outside a judge's authority. Even if we were inclined to again act when the Legislature has not, a mandamus proceeding is not the appropriate place to interpret statutory language, clarify this Court's precedent, or create law where there is none. We hold that the absence of existing law precluded granting the State's mandamus relief below; it is by no means an endorsement of the judge's action.

■ Judge Alcala maintains that, because the judge whose act was the subject of the court of appeals' opinion no longer is the presiding judge, we are required to abate these proceedings for a response from the current presiding judge under Texas Rule of Appellate Procedure 7.2(b).[35] The assertion stems from misreading the rule. Rule 7.2(b) states, in relevant part, "If the case is an original proceeding under Rule 52, the court must abate the proceeding to allow the successor to reconsider the original party's decision." Rule 52 governs only original proceedings in the Supreme Court of Texas and the courts of

appeals, as evidenced by its location under Section Three, entitled "Original Proceedings in the Supreme Court and the Court of Appeals." Instead, this mandamus application comes to this Court by way of "Rule 72. Extraordinary Matters." Like Rule 52, Rule 72 is found under a section that affects its application—"Section Five: Proceedings in the Court of Criminal Appeals." We are therefore not bound by Rule 7.2(b)'s requirement to abate.

Further, if we were to abate for a response from the current presiding judge after reconsidering his predecessor's ruling, it would do nothing to correct the court of appeals' erroneous conclusion that a trial judge has no discretion when presented with a request for a pre-trial hearing on intellectual disability. And by addressing the merits of the case we do not limit the presiding judge's ability to reconsider his predecessor's ruling; we only remove the inherent influence of a superior court's opinion expressing its view on what it perceives to be the only permissible ruling.

### Legislative Action

Without legislation, case law has necessarily sculpted the boundaries of intellectual disability in a piecemeal fashion since 2002. In terms of issues surrounding intellectual-disability determinations, we still find ourselves in the same legislative "interregnum" that existed in 2004. Public-policy arguments quickly pile up on both sides of the debate on when and by whom intellectual-disability determinations should be made; several have been presented to this Court. But they find utility only in the Legislature and should be directed there.

---

33. *See Post*, at 60 (Alcala, J., dissenting).

34. *Post*, at 66 (Newell, J., dissenting).

35. *Post*, at 61–63 (Alcala, J., dissenting).

While we withhold normative judgment, the need for a statutory scheme on this score is readily apparent, and its continued absence portends serious consequences for our criminal-justice system. Without a unified procedure, intellectual-disability determinations may vary from county to county, court to court, and case to case. As the present cases and authorities cited in this opinion illustrate, some judges may prefer to address the issues pretrial, others by submission of a special issue to the jury. The gravity of defendants' intellectual-disability claims are too weighty to be subject to such disparity. The uncertainty may come at a cost to the State as well. If determined pretrial, it remains to be seen whether the State is afforded an adequate remedy should the judge conclude, incorrectly in the State's opinion, that a defendant is exempt from the death penalty as a result of his intellectual disability. The trial- and sentence-altering decision may escape appellate review entirely under existing law.[36] We now make explicit what we before expressed only tacitly: Legislation is required.

### Conclusion

█ Because we find that Allen's request for a pretrial determination of intellectual disability does not call for the execution of a ministerial act, we conditionally grant mandamus relief and order the court of appeals to rescind its judgment conditionally granting the State's (as Relator below) petitions for writ of mandamus. The writs of mandamus will issue only in the event that the court of appeals fails to comply with this opinion.

Meyers, J., filed a concurring opinion.
Yeary, J., filed a concurring opinion.

Alcala, J., filed a dissenting opinion.
Newell, J., filed a dissenting opinion in which Keller, P.J., and Alcala, J., joined.
Johnson, J., concurred.

Meyers, J., filed a concurring opinion.

I agree with the majority's analysis of the mandamus issue in this case. I write separately to address the dissenting opinions. Judge Alcala's position on mootness is incorrect. Her solution would be similar to saying that if a judge made a pretrial ruling on a suppression hearing and there was a new judge at the trial, then the ruling in the pretrial hearing would be moot. This is simply not the case. A new judge at trial does not render moot the ruling made by another judge in a pretrial hearing.

Additionally, while I agree with Judge Newell that this is a punishment issue, it is no different than conducting a pretrial determination of whether the defendant was a juvenile at the time of the offense or whether the victim of the offense was below the age of six. Both of these are sentencing issues that would determine whether a defendant would be eligible for the death penalty, and both are properly conducted prior to the beginning of the trial.

With the foregoing comments, I join the majority.

Yeary, J., filed a concurring opinion.

Applicant, Tyrone Allen, is charged in two indictments with capital murder. Applicant requested a pre-trial hearing on the issue of whether he is intellectually disabled and thus immune from the death penalty. The trial court granted that mo-

---

36. *See State ex rel. Lykos v. Fine,* 330 S.W.3d 904, 912–14 (Tex.Crim.App.2011) (holding that the State did not have an adequate remedy at law because Code of Criminal Procedure article 44.01 does not permit the State to appeal a pretrial ruling that the death penalty is unconstitutional). *Accord In re Watkins,* 2014 WL 5903105 at *6.

tion, but the State sought a writ of mandamus from the court of appeals to compel the trial court to vacate its order permitting the pre-trial hearing. Now Applicant seeks a writ of mandamus from this Court to compel the court of appeals to withdraw its order disallowing the pre-trial hearing, and this Court conditionally grants the writ, finding that "uncertainty surrounding intellectual-disability determinations prevents labeling the judge's actions a violation of a ministerial duty." Majority opinion at 48. I join this Court's opinion. I also write separately to provide a little more context to the complex problem created by the United States Supreme Court's declaration that mentally retarded offenders are immune from the death penalty and to urge the Legislature to address this still relatively new development in capital jurisprudence to provide both a workable definition of mental retardation in the context of the death penalty and an appropriate procedure for the litigation of that issue.

In *Atkins v. Virginia,* decided in 2002, the United States Supreme Court discerned a national consensus against the execution of "mentally retarded" offenders and declared that such offenders are categorically immune from the death penalty. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The Court observed, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Id.* at 317, 122 S.Ct. 2242. The Court noted, "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom

there is a national consensus." *Id.* But the Court refused to provide a clear framework for separating "the sheep from the goats." [1] Instead, it expressly left to the states "the task of developing appropriate ways to enforce the constitutional restriction" it had declared. *Atkins,* 536 U.S. at 317, 122 S.Ct. 2242. In so doing, it forced upon the states the burden to address the challenges posed by the inevitable onslaught of claimants seeking to establish their categorical immunity from capital punishment.

In 2004, in response to *Atkins,* and in the absence of legislation in Texas carrying out the mandate of *Atkins,* but with an eye toward providing "the bench and bar with temporary judicial guidelines in addressing *Atkins* claims," this Court acted to create "judicial standards for courts considering [*Atkins* ] [post-conviction habeas corpus] claims under [Texas Code of Criminal Procedure] article 11.071." *Ex parte Briseno,* 135 S.W.3d 1, 5 (Tex.Crim. App.2004). The Court concluded it needed to act because of the "significant number of pending habeas corpus applications" it faced that argued exemption from execution based on mental retardation. *Id.*

This Court used *Briseno* to "define [from its own perspective] that level and degree of mental retardation at which a consensus of Texas citizens [2] would agree that a person should be exempted from the death penalty." *Id.* at 6. The Court recognized that, the term "mental retardation" as defined in the DSM–IV included those categorized as mildly, moderately, severely, and profoundly mentally retarded, and

---

1. Matthew 25:32, The New American Bible, Catholic Publishers, Inc. (1971).

2. Although this Court did not explain why it felt compelled to define the level according to what it perceived to be a consensus of *Texas citizens* as opposed to *American citizens,* I

presume it had in mind the Supreme Court's delegation of the duty to the States to develop "appropriate ways" to "enforce the constitutional restriction" it had spoken into existence in *Atkins. Atkins,* 536 U.S. at 317, 122 S.Ct. 2242.

that "some 85% of those officially categorized as mentally retarded fall into" the mildly mentally retarded range. *Id.* at 5. The Court observed that "mental retardation is not necessarily a lifelong disorder." *Id.* at 6. And it noted that "those in the mental health profession" might understandably "define mental retardation broadly to provide an adequate safety net for those who are at the margin" and who "might well become mentally-unimpaired citizens if given additional social services support." *Id.* The Court questioned whether "a consensus of Texas citizens" would agree "that all persons who might legitimately qualify for assistance under the social services definition of mental retardation" should be "exempt from an otherwise constitutional penalty." *Id.* But in the absence of legislative guidance, it adopted the definitions of "mental retardation" then promulgated by the American Association on Mental Retardation (AAMR)[3] and section 591.003(13) of the Texas Health and Safety Code. *Id.* Those definitions were very similar.

The AAMR definition provided that mental retardation is a disability characterized by (1) "significantly subaverage" general intellectual functioning, (2) accompanied by "related" limitations in adaptive functioning, and (3) onset prior to the age of 18. *See Ex parte Briseno,* 135 S.W.3d 1, 7 (Tex.Crim.App.2004). The most recent amendment to the Texas Health and

Safety Code definition of "mental retardation" defines it as "intellectual disability," and it defines "intellectual disability" as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEALTH & SAFETY CODE § 591.003(13) & (7–a).

Recently, in *Hall v. Florida,* —— U.S. ——, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), an opinion overturning Florida's rule, which barred persons presenting only IQ test scores over 70 "from presenting other evidence" that would show intellectual disability, the Supreme Court followed the mental health community's modification of the name "mental retardation" to "intellectual disability." The Court explained, "[p]revious opinions of this Court have employed the term 'mental retardation.' This opinion uses the term 'intellectual disability' to describe *the identical phenomenon.* [citations omitted]." 134 S.Ct. at 1990 (emphasis added). Clearly the Supreme Court was referring to the *identical phenomenon* in *Hall* as was referred to in *Atkins.*

In *Hall,* the Court also made the observation that, in its opinion "the medical community [still] defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior

---

3. The Supreme Court referred to the AAMR definition of mental retardation in *Atkins.* 536 U.S. at 308 n.3 & 317 n.22, 122 S.Ct. 2242. That organization has now changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD). The Supreme Court also referred to the American Psychiatric Association (APA) definition of mental retardation as it was then described in the Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM IV–TR): "The essential feature of Mental Retardation is significantly subaverage general

intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders p. 41 (4th ed. 2000).

to changing circumstances), and onset of these deficits during the developmental period." *Id.* at 1994. But the changes happening in the mental health community's leading reference materials on intellectual disability deserve closer scrutiny, as they appear to indicate that the community may be moving toward a completely new understanding of the disorder described in *Atkins*—an evolution to an understanding of the disorder which may or may not be consistent with the Supreme Court's Eighth Amendment jurisprudence and which may or may not be consistent with what that Court proclaimed in *Atkins* to be the current "national consensus" concerning execution of the mentally retarded.

Justice Alito pointed out in his dissenting opinion in *Hall* that, "the views of professional associations often change." 134 S.Ct. at 2006 (Alito, J., dissenting). Indeed, the most recent revision of the APA's Diagnostic and Statistical Manual of Mental Disorders, the DSM–V, contains notable and consequential changes with respect to not only the name, but also the definition of the disorder. The most obvious change, of course, is the name of the disorder. It was previously known as "mental retardation." It is now described as "intellectual disability." But more important for purposes of considering the APA's understanding of the disorder and its relationship to Eighth Amendment jurisprudence, and particularly the death penalty, is the fact that the essential criteria for inclusion appears also to have been modified significantly.

The DSM–IV–TR previously explained that "[t]he essential feature of Mental Retardation is *significantly* subaverage general intellectual functioning (Criterion A) that is accompanied by *significant* limita-

tions in adaptive functioning in at least two of the following areas ... (Criterion B)." [4] The DSM–V now explains that "[t]he essential features of intellectual disability ... are deficits in general mental abilities (Criterion A) and impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers ... (Criterion B)." [5] Where the former essential features of "mental retardation" described Criterion A as *"significantly* subaverage general intellectual functioning," the new essential features of "intellectual disability" describe Criterion A as merely "deficits in general mental abilities." Similarly, where the former essential features of "mental retardation" described Criterion B as *"significant* limitations in adaptive functioning" the new essential features of "intellectual disability" describe Criterion B as merely "impairment in, everyday adaptive functioning." These changes, and particularly the dropping of any notion of "significance" with regard to the essential features, seem to me to indicate that an expansion may be at hand—at least from the perspective of the mental health community—of the numbers of persons that might be potentially subject to a diagnosis for the disorder. In addition, the former essential features relating to Criterion B seemed to require comparison of the individual to society at large, whereas the new essential features relating to that same criterion seem to require specific comparison "to an individual's age-, gender-, and socioculturally matched peers."

The Supreme Court assures us that its determination is "informed by the views of medical experts" but that those views "do *not dictate* the Court's decision." *Hall*, 134 S.Ct. at 2000. That Court counsels that "[t]he legal determination of intellec-

**4.** APA, Diagnostic and Statistical Manual of Mental Disorders 41 (rev. 4th ed. 2000).

**5.** APA, Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed. 2013).

tual disability is distinct from a medical diagnosis," but the Court is also clear that the legal framework should be "informed by the medical community's diagnostic framework." *Id.* Hence, the medical community's diagnostic framework cannot be ignored in fashioning an appropriate response to the Supreme Court's mandate in *Atkins.* But, it seems to me that the medical community's diagnostic framework in place *when Atkins was decided* might be the most appropriate guidepost, not necessarily some potential variant that might be arrived at by associations of mental health professionals as they seek to further refine their professional diagnostic criteria. That diagnostic framework—the one in place at the time that *Atkins* was decided—is the one about which the Supreme Court claimed to discern a national consensus. While the medical community may refine its framework at any time, refinements by that community alone and in isolation give no concrete assurance that such refinements are consistent with any national consensus about death penalty immunity. To hold otherwise would seem nothing less than a complete delegation of the responsibility to identify who is categorically immune from the death penalty away from the courts and the legislatures and the people of this country, and instead to shift that responsibility to the elite leaders in the mental health community.

While I agree that it is important to remain informed by the mental health community concerning current professional thought and diagnostic criteria, the courts and the legislatures of the various states are the true laboratories for the ascertainment of national consensus, if any actually exists, concerning constitutional death penalty immunity. *See, e.g., Ex parte Cathey*, 451 S.W.3d 1, 9–10 (Tex. Crim.App.2014) (explaining, "Although psychology and psychologists inform the factual decision, they do not determine whether an inmate is exempt from execution under *Atkins.* ·We must apply our own judgment....."). The goals and objectives of the mental health community may not always necessarily align neatly with those of the criminal justice system. Indeed, care should be taken to guard against improper motives of some who might claim the right to define mental retardation so broadly as to cover any person who might seek a diagnosis in order to avoid the requirements of justice under the law.[6] The death penalty is a punishment, not a disease.

This case presents a perfect illustration of the inefficiencies that can, and likely will, continue to arise because of the failure of our State to legislatively define mental retardation and establish procedures to give effect to the Supreme Court's mandate in *Atkins.*[7] In the event the trial court in this case conducts a pretrial hearing to determine whether the defendant is mentally retarded, the proof at that hearing will likely include, in addition to any other evidence reflecting directly upon the criteria for establishing mental retardation, a trial of the very facts of the capital murder offense itself—separately and before the actual guilt or innocence

---

6. *See, e.g., Cathey*, 451 S.W.3d at 15 n.42 (observing that Professor Flynn "advocates adjusting IQ scores when the death penalty is at stake because then an IQ score may be a matter of 'life or death' ").

7. On at least one prior occasion, our Legislature has passed such a bill. According to the Supreme Court's opinion in *Atkins*, the bill passed through the House on April 24, 2001, and through the Senate on May 16, 2001, but then-sitting Governor Perry vetoed the legislation on June 17, 2001. *Atkins*, 536 U.S. at 315 n.16, 122 S.Ct. 2242.

phase of the trial.[8] Then, during the defendant's trial, the same evidence will likely be presented again. In effect, therefore, the whole case might need to be tried twice. The State will be required to marshal its evidence twice, and the witnesses will be forced to face the court and examination by counsel twice. This, it seems to me, is an unnecessary hardship for everyone involved.

The majority has already explained that "[l]egislation is required"[9] with regard to a statutory scheme for the administration of mental retardation claims. I too urge the Legislature to tackle this hard issue with all deliberate speed and to provide the guidance that is uniquely the province of that body. This Court and the other courts of our State and the people of our State need and deserve a unified procedure for the determination of these questions. We also need the Legislature to provide a clear definition of mental retardation that ought to be applied in carrying out the mandate of *Atkins* that mentally retarded persons are constitutionally protected from the death penalty.

With these additional comments, I join the opinion of the Court.

Alcala, J., filed a dissenting opinion.

Because the ministerial act that is at the center of the dispute in this case was performed by a trial judge who is no longer on the bench and has no power to change the offending order, the court of appeals's decision to conditionally grant a writ of mandamus against that trial judge has become moot during the pendency of this proceeding. The appropriate action by this Court, which is effectively reviewing the propriety of the court of appeals's judgment conditionally granting mandamus relief against a former trial-court judge, is to order the appellate court to vacate its prior judgment, hold the petition in abeyance, and abate the case to the trial court. The purpose of abatement under these circumstances is to permit the current trial-court judge to determine whether he will adopt as his own the former trial court's order permitting a pretrial determination on intellectual disability. If the current trial judge does adopt the former judge's order, then the court of appeals may reinstate its judgment by ordering that a writ of mandamus will issue against the current trial judge, and the mandamus proceedings in this Court may move forward as they now have. But if the current trial judge does not adopt the former judge's order, then the court of appeals must dismiss the petition as moot because the offending order would no longer exist. In short, under the current procedural posture of this case, this case has become moot during the pendency of this appeal. This Court accordingly lacks jurisdiction to issue a writ of mandamus against the court of appeals because the subject of the proceedings in this Court—the appellate court's order conditionally granting a writ of mandamus against a former trial-court judge—no longer constitutes a live controversy in light of the fact that the former trial judge has no authority to rescind the offending order or to comply with the court of appeals's writ. Any resulting opinion by this Court in reviewing this

8. *See Ex parte Briseno,* 135 S.W.3d 1, 8–9 (Tex.Crim.App.2004) (identifying "other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder," including "[p]utting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?").

9. Majority opinion at 54.

matter, therefore, is necessarily purely advisory.

Alternatively, assuming that this Court has jurisdiction to order the court of appeals to rescind its judgment conditionally granting a writ of mandamus against a former judge who lacks authority to comply with the writ, I am persuaded by the argument presented in the dissenting opinion by Judge Newell that, under the judicial-ripeness doctrine, a trial court lacks jurisdiction to conduct a pretrial determination of intellectual disability in a capital-murder case, and I join his opinion. Alternatively, further assuming that this Court properly considers the petition on the merits, I would uphold the court of appeals's judgment granting the State's original application for a writ of mandamus to preclude the trial court from conducting a pretrial determination of intellectual disability. Mandamus relief is appropriate when a trial court has no discretion, as here, but to abide by principles of law that have been in effect for more than a decade: the jurisdictional doctrine of ripeness, Texas statutes, and this Court's precedent for addressing this type of claim.

## I. Abatement to the Trial Court Is Required Under the Doctrine of Mootness

Given that the trial judge who granted relator's motion for a pretrial intellectual-disability hearing, Judge Larry Mitchell, is no longer the presiding judge of the 292nd Judicial District Court, this Court is obligated to order the court of appeals to vacate its prior judgment and abate the case to the trial court so that the now-presiding judge may have the opportunity to reconsider the previous trial judge's original ruling in this case. Such an approach is consistent with the applicable law, which indicates that abatement is generally required under these circumstances for the purpose of allowing a successor judge to reconsider a prior judge's disputed ruling in order to ensure that an actual controversy continues to exist in the case. Moreover, under the particular facts of this case, the current proceedings have, at this stage, been rendered moot as a result of the original trial judge being succeeded in office by another judge. Absent any further ruling by the current presiding judge that indicates the continuing existence of a live controversy, the resulting opinion by this Court addressing the merits of this petition constitutes a prohibited advisory-only opinion.

### A. Applicable Law Governing Propriety of Abatement

The Texas Supreme Court has observed that mandamus "will not issue against a new judge for what a former one did." *In re Baylor Med. Ctr. at Garland*, 280 S.W.3d 227, 228 (Tex.2008) (explaining that abatement is required "to allow the successor [judge] to reconsider the order"); *see also In re Schmitz*, 285 S.W.3d 451, 453 (Tex.2009) (observing that, when judge whose ruling is at center of mandamus proceeding is succeeded by another, "[n]ormally, this would require abatement for reconsideration"); *State v. Olsen*, 163 Tex. 449, 360 S.W.2d 402, 403 (1962) (per curiam) (observing that, because original trial judge who was party to mandamus proceeding had died, proceeding was "moot," and holding that "[a] writ of mandamus will not lie against a successor judge in the absence of a refusal by him to grant the relief Relator seeks"). This rule has its foundation in the Texas Rules of Appellate Procedure, which provide that, when a public officer is a party to an original mandamus proceeding in the Supreme Court or a court of appeals and he ceases to hold office before the mandamus proceeding is finally disposed of, the court "must abate the proceeding to allow the

successor to reconsider the original party's decision." TEX.R.APP. P. 7.2(a), (b). The rationale underlying the rule is that, for mandamus relief to lie, a live controversy must exist between the parties. "A case becomes moot if a controversy ceases to exist between the parties at any stage of the legal proceedings, including the appeal." *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 737 (Tex.2005) (orig. proceeding); *see also State Bar of Tex. v. Gomez,* 891 S.W.2d 243, 245 (Tex.1994) (orig. proceeding) (stating that for controversy to be justiciable, there must be a real controversy between the parties that actually will be resolved by the judicial relief sought); *Dow Chem. Co. v. Garcia,* 909 S.W.2d 503, 505 (Tex.1995) (Court will not issue mandamus relief if it would be useless or unavailing). Because a pretrial ruling by a trial judge who is no longer in office may readily be rescinded and superseded by a subsequent pretrial ruling from the successor judge, a dispute stemming from such a ruling is essentially moot, and, as such, that type of ruling cannot form the basis of a live controversy that is the subject of mandamus proceedings. *See Kellogg,* 166 S.W.3d at 737; *see also In re Bonilla,* 424 S.W.3d 528, 534 (Tex.Crim. App.2014) (declining to grant mandamus relief and dismissing petition because "particular dispute" had become "moot"); *State ex rel. Holmes v. Denson,* 671 S.W.2d 896, 899 (Tex.Crim.App.1984) (where relief sought has become moot, "there is nothing to mandamus, ergo mandamus does not lie").

**B. Abatement Is Required In Light of Mootness**

Applying these principles to the present context, I observe that all of the foregoing rationales for requiring abatement to a successor trial-court judge are relevant to this case. Here, the controversy between the parties stems from the action of the original trial-court judge in granting relator's motion for a pretrial intellectual-disability hearing. The continuing viability of that ruling is, at this point, questionable at best. The successor judge has had no opportunity to revisit the prior judge's ruling because of the pendency of these mandamus proceedings and the resulting stay of all proceedings in the trial court. At some point in the future, proceedings in this case will necessarily resume in the trial court, at which point the successor judge will have plenary power over the case and will be fully authorized to rescind the prior judge's orders granting relator's request for a pretrial hearing. As this Court's majority opinion accurately observes, because this is a mandamus proceeding, this Court is not actually deciding the propriety of the trial court's order, and thus there would not be any law of the case to prohibit the successor judge from reconsidering this pretrial ruling. Given these circumstances, there exists no live controversy between the relevant parties because the person who granted the challenged motion, the former trial judge, now lacks the authority to either carry out or rescind his original ruling. In the absence of a live controversy between the parties, mandamus relief is inappropriate. *See Kellogg,* 166 S.W.3d at 737.

With respect to the appellate-court proceedings in this matter, I observe that, like the proceedings in the trial court, the result of those proceedings—the order conditionally granting the State's request for mandamus relief against the former judge—has similarly been rendered moot as a result of Judge Mitchell's departure from the bench. The appellate court's order in this case was directed at Judge Mitchell and was not directed more generally at the trial court. *See Schmitz,* 285 S.W.3d at 454 ("Of course, the writ must be directed to someone[.]"); *O'Connor v. First Court of Appeals,* 837 S.W.2d 94, 97

(Tex.1992) (must be proper request stating correct legal reason directed to judge against whom mandamus is sought). But, now that Judge Mitchell is no longer in a position of authority to comply with the appellate court's mandamus order, that order cannot be enforced against him. *See Baylor*, 280 S.W.3d at 228. And because the writ was not directed at the trial court, the appellate court's mandamus order cannot properly be enforced against the successor judge or anyone else. *See id.* To the extent that we are presently reviewing the propriety of the court of appeals's conditional grant of mandamus relief, this Court's majority opinion does not explain how a live controversy continues to exist with respect to the appellate court's order, which, at this point, has become moot because it is directed at a person who is no longer in a position to effectuate it. Moreover, the rules of appellate procedure and case law prohibit enforcement of that order against the current presiding judge, absent an opportunity for him to revisit the ruling. *See id.*; Tex.R.App. P. 7.2. And the rules and case law further provide that a trial judge must be provided such an opportunity. *See id.* Because the court of appeals's mandamus order directed at the previous trial judge is clearly unenforceable against the current presiding judge and, therefore, moot, any opinion by this Court reviewing the propriety of that order is necessarily advisory in nature. *See Pfeiffer v. State*, 363 S.W.3d 594, 600 (Tex. Crim.App.2012) (observing that this Court is "without authority" to render advisory opinions).

It is suggested that Judge Mitchell's succession by another judge is irrelevant to our resolution of the proceedings in this Court because, at this stage, we are not directly considering the trial judge's ruling in granting relator's motion for a pretrial hearing, but we are instead considering whether a writ of mandamus from this Court is an appropriate vehicle to correct the court of appeals's judgment in the proceedings below. I observe, however, that regardless of the procedural posture in which this case comes to us, the requirement of a live controversy between the parties persists, and a case may become moot if a controversy ceases to exist "at any stage of the proceedings, including the appeal." *Kellogg*, 166 S.W.3d at 737. However desirable it may seem to correct what is viewed as an erroneous ruling by the court of appeals, a writ of mandamus from this Court is an inappropriate vehicle to do so when the underlying appellate-court order is no longer enforceable against any party to these proceedings.

Along these same lines, it is suggested that abatement is not required because Rule 7.2 does not apply directly to proceedings in this Court. I, however, observe that, to the extent that we are reviewing the propriety of the appellate court's actions in conditionally granting mandamus relief, we are bound to consider Rule 7.2 because it is applicable to mandamus proceedings in the court of appeals. *See* Tex.R.App. P. 7.2(b); *Baylor*, 280 S.W.3d at 228. Furthermore, because the court of appeals issued its opinion on October 3, 2014, while Judge Mitchell was still on the bench,[1] that court has never been afforded the opportunity to decide whether abatement is required under that rule. Given the change in circumstances that has arisen since the time its opinion was issued, the appellate court should now be afforded the opportunity to comply with the rule.

1. *See In re Watkins*, Nos. 05–14–01167–CV, 05–14–01168–CV, 2014 WL 5903105 (Tex. App.—Dallas Oct. 3, 2014).

Now that Judge Mitchell had been superseded in office, the appropriate and required course of action is abatement in order to give the current presiding judge an opportunity to reconsider the previous ruling granting relator's request for a pretrial intellectual-disability hearing, thereby ensuring the continued existence of a live controversy in this case. *See* Tex.R.App. P. 7.2(b); *Baylor*, 280 S.W.3d at 228. The court of appeals's order conditionally granting mandamus relief to the State in the proceedings below is now moot because it is directed at the former judge who is no longer in a position to take any action on that order, and that order may not properly be enforced against the successor judge. *See id.* Because the Court determines that, notwithstanding these circumstances that eliminate the existence of a live controversy in this case, mandamus relief is nonetheless warranted, I disagree with the Court's decision to conditionally grant relator's requested relief.

## II. Assuming that Court Properly Considers Relator's Petition, His Requested Relief Should Be Denied

Even were I to agree that this Court properly addresses the merits of relator's present request for mandamus relief, I would nevertheless disagree with the Court's decision to grant that relief. As indicated above, I agree with the position taken by Judge Newell that a trial court lacks jurisdiction to conduct a pretrial hearing on intellectual disability because that issue is not ripe until the punishment phase of trial.

Further assuming that this Court has jurisdiction to address this moot order pertaining to an unripe matter, I conclude that, on the merits, mandamus relief is unwarranted. Before addressing the merits, it is important to understand the way that the statutory scheme set forth by the Legislature has worked, at least until this Court's decision today. Through numerous provisions, the Code describes a capital-murder proceeding as follows: The State decides to seek the death penalty against a person indicted for capital murder; individual voir dire is conducted; the State presents evidence in a guilt stage of trial; a jury decides whether the evidence proves capital murder; if the jury has convicted a defendant of capital murder, it answers certain special issues in a sentencing phase of trial; the trial court sentences a defendant either to life in prison or to the death penalty depending on the jury's answers to the special issues; and, on appeal, a defendant either files a notice of appeal to the court of appeals challenging his life sentence or there is an automatic appeal of his death sentence to this Court. Up until today, a defendant's claim of intellectual disability has been addressed either in the sentencing phase of his capital-murder trial or in a post-conviction hearing.

In contrast to this procedural scheme that has been followed in Texas for over a decade, here, at a pretrial stage, the trial court would conduct a hearing at which relator is given the opportunity to prove that he is intellectually disabled before he is ever tried or convicted of capital murder. At this pretrial stage, the State would have to provide evidence establishing a defendant's guilt of the offense in order for the fact finder to be able to assess how that evidence may weigh into assessing whether he is intellectually disabled. This pretrial hearing would essentially become applicant's first trial on guilt and would require the State to marshal all of its evidence to show his role in the commission of that offense. If a defendant is determined to be intellectually disabled, a trial court may decide to deprive the State of the opportunity to seek the death penalty based on the court's determination

that the defendant would be constitutionally ineligible for it. Alternatively, even if he is found to be intellectually disabled at the pretrial hearing, the State would still have the right to individual voir dire and to seek the death penalty, at least according to the provisions in the Code of Criminal Procedure that are discussed below. After the pretrial hearing, therefore, applicant's regular guilt trial would occur. Assuming he is found guilty of capital murder, applicant would again be permitted to present any evidence of his intellectual disability, as that would be relevant to the mitigation special issue. Assuming that he is sentenced to death, applicant likely would have a third opportunity to present evidence of his intellectual disability in an application for a writ of habeas corpus either through a claim asserting ineffective assistance of counsel or through any new evidence on that subject. The end result of all of this will be that the guilt evidence will be presented twice, at the pretrial hearing and at the regular trial, and the defendant will have at least three opportunities to prove his intellectual-disability claim: at the pretrial hearing, regular trial, and in post-conviction proceedings.

There is only one rational decision under unequivocal, well-settled, and clearly controlling legal principles: This bizarre procedural scheme, fancifully created by this single trial court judge, is contrary to over a decade of jurisdictional principles, legislative statutes, and this Court's precedent. This Court should not abdicate its responsibility to ensure that the law in Texas is not applied by a single trial judge in such an extraordinary and absurd manner. *See, e.g., In re State ex. rel. Weeks*, 391 S.W.3d 117, 122 (Tex.Crim.App.2013). Because the State has shown that under well-established and long-standing law it is entitled to mandamus relief against this aberrant order, this Court has no discretion but to uphold the appellate court's order conditionally granting the State the relief that it seeks, as explained more fully in my two points below.

## A. When Viewed in Their Totality, Texas Statutes Applicable to Capital–Murder Trials Preclude a Pretrial Determination

In this context, it is unnecessary to lament the Legislature's failure to specifically pass statutes that would address how intellectual-disability claims should be handled because the Legislature has enacted general procedures for the litigation of a capital-murder case that, when viewed in their totality, definitively control the process applicable to such a proceeding. A pretrial determination of intellectual disability is outside the realm of what the Legislature has described with respect to the procedures applicable in a capital-murder trial. The absence of a specific rule disallowing a pretrial determination as to intellectual disability, therefore, is immaterial.

Through numerous statutes, the Legislature has enacted a general procedural scheme applicable to all capital-murder cases based only on the State's representation that it is seeking the death penalty. *See* TEX.CODE CRIM. PROC. art. 35.15(a) ("In capital cases in which *the State seeks* the death penalty both the State and defendant shall be entitled to fifteen peremptory challenges."); *Id.* art. 35.17, § 2 ("In a capital felony case in which *the State seeks* the death penalty, the court shall propound to the entire panel of prospective jurors questions [and].... examine each juror on voir dire individually and apart from the entire panel"); *Id.* art. 37.071, § 2(a)(1) ("If a defendant is tried for a capital offense in which *the state seeks* the death penalty, on a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding

to determine whether the defendant shall be sentenced to death or life imprisonment without parole."); *Id.* art. 37.071, § 1 ("If a defendant is found guilty in a capital felony case in which *the state does not seek* the death penalty, the judge shall sentence the defendant" to life imprisonment without parole.); *see also id.* art. 37.0711 §§ 2, 3 (emphasis added in all the parentheticals). These mandatory provisions are contingent only on the State's decision to seek the death penalty. Based on the general scheme set forth by the Legislature establishing rules that become applicable to a capital murder case only upon the State's decision to seek the death penalty, it is clear that the trial court has no discretionary authority to create an additional barrier to the State's right to seek the death penalty in the form of a pretrial determination of intellectual disability.

Perhaps, in this case, even if the trial court were to decide in a pretrial hearing that relator is intellectually disabled, the trial court would nonetheless permit this trial to proceed as it normally would in a capital-murder case in which the State seeks the death penalty, with, for example, individual voir dire and special issues in the sentencing phase. Even if that were to occur, I would hold, based on the entire statutory scheme set forth by the Legislature that is mandatory and contingent only upon the State seeking the death penalty, that a trial court has no statutory authority to additionally require the State to successfully defend against a defendant's pretrial claim of intellectual disability as a prerequisite to the normal progression of a capital-murder trial.

**B. Permitting a Pretrial Determination on Intellectual Disability is Clearly Unauthorized by this Court's Jurisprudence**

This Court's jurisprudence in *Ex parte Briseno* has set forth the standard for determining whether a particular defendant is ineligible for the death penalty due to intellectual disability, but that standard contemplates that a defendant has already been found guilty of capital murder. *See Ex parte Briseno,* 135 S.W.3d 1, 8–9 (Tex. Crim.App.2004) (setting criteria for determination of intellectual disability); *see also Ex parte Sosa,* 364 S.W.3d 889, 890 (Tex.Crim.App.2012). The *Briseno* standard operates under the assumption that the defendant is in fact guilty of the capital murder for which he has been indicted. *Id.* One of the *Briseno* factors specifically asks, "Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?" *Id.* At a pretrial stage, a defendant is presumed innocent and no facts of the commission of the offense have been proven. *See Coffin v. United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."). The constitutional principle that a defendant be presumed innocent until proven guilty stands in stark contrast to this Court's jurisprudence for deciding an intellectual-disability claim that requires consideration of a defendant's actions while committing the capital murder for which he has been found guilty. I conclude that a trial court lacks the discretion to conduct a pretrial hearing on intellectual disability in contravention of federal constitutional law or this Court's jurisprudence.

**III. Conclusion**

Because the trial judge who granted relator's motion for a pretrial intellectual-disability determination is no longer presiding over relator's capital-murder trial,

and because the appellate court's order conditionally granting mandamus relief was directed against that judge, I conclude that abatement is required in order to afford the now-presiding judge an opportunity to revisit the underlying ruling in this case. In the absence of abatement, mandamus will not lie against the successor judge, and any ruling by this Court evaluating the appellate court's conditional grant of mandamus relief, which has now been rendered moot, will necessarily be advisory.

Even accepting the correctness of the majority opinion's decision to address the merits of relator's petition, I observe that the argument, "But you didn't say that I couldn't do *this*" is not a persuasive argument from my kids when they act in contravention to one of my general rules, nor is it here, where it is abundantly clear that federal, statutory, and state rules that have been generally set forth apply to cover this situation. Because, as Judge Newell has explained, an intellectual-disability claim is not yet ripe at a pretrial stage, and because the legislative statutes and this Court have definitively set forth a procedural scheme that requires that intellectual-disability claims be litigated during the sentencing phase or in the post-conviction phase of a capital-murder trial, I respectfully dissent.

Newell, J., filed a dissenting opinion in which Keller, P.J., and Alcala, J., joined.

## OPINION

The majority conditionally grants mandamus relief to Relator Tyrone Allen thereby paving the way for a pre-trial determination of whether he is exempt from the death penalty due to his intellectual disability.[1] According to the majority, the uncertainty surrounding the determination of intellectual disabilities in the context of a death-penalty case prevents labeling the trial court's actions a ministerial duty. While I share the majority's frustration with the lack of legislative guidance on this subject, I reluctantly dissent from this holding. I believe the majority's focus upon the question of whether the determination is limited to a jury overlooks whether such a determination is timely prior to conviction. On that question, the law is considerably more settled and clearly prohibits a pre-trial determination of a sentencing issue prior to conviction.

The majority comprehensively sets out the case law surrounding the determination of intellectual disability. In *Briseno,* this Court fashioned what were supposed to be temporary guidelines on determining intellectual disability, but even as it did, the Court carefully noted that *Atkins* does not require a jury determination of intellectual disability. *Ex parte Briseno,* 135 S.W.3d 1, 9–10 (Tex.Crim.App.2004). This Court observed in *Hunter v. State* that the United States Supreme Court had even overturned the Ninth Circuit's order commanding Arizona courts to conduct a jury trial to resolve intellectual-disability claims. *Hunter v. State,* 243 S.W.3d 664, 672 (Tex.Crim.App.2007) (citing *Schriro v. Smith,* 546 U.S. 6, 7–8, 126 S.Ct. 7, 163

---

**1.** I am not suggesting that the majority is advocating for this procedure. Nevertheless, the effect of the majority's decision opens the door for the exact procedure that the majority seems to decry. And the effect of this ruling will be felt not only in this case, but in other cases as well. I share the majority's hope that the impact of this case might encourage the legislature to provide much needed guidance on how the State should address intellectual-disability claims in death-penalty cases. But I reluctantly dissent because I am unwilling to abandon our precedent regardless of how much I might want to spur the legislature to action.

L.Ed.2d 6 (2005)).[2] And while this Court has endorsed a jury finding on intellectual disability, this Court has not held that it is constitutionally required. *See, e.g., Williams v. State,* 270 S.W.3d 112, 132 (Tex.Crim.App.2008). The majority is exactly right that this Court has repeatedly left the door open for the legislature to act, and our stop-gap measures should not be mistaken for constitutional requirements.

But this lack of legislative guidance does not necessarily translate into unfettered judicial discretion. It is well settled that courts lack the authority to address claims that are not ripe for review. "At the time a lawsuit is filed, ripeness asks whether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Patterson v. Planned Parenthood of Houston and Southeast Texas, Inc.,* 971 S.W.2d 439, 442 (Tex.1998) (citing 13A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, § 3532.1, at 130 (2d ed.1984)). Though this Court has not directly quoted Professor Wright, we have repeatedly rejected claims that were not ripe for review. *See, e.g., Ex parte Smith,* 185 S.W.3d 887, 893 (Tex.Crim.App.2006) (rejecting an *in pari materia* claim because it was not ripe for review); *Ex parte Weise,* 55 S.W.3d 617, 621 (Tex.Crim.App.2001) (declining to address whether the illegal-dumping statute required a culpable mental state prior to trial because the issue was not ripe).

The courts of this state are not empowered to give advisory opinions; this prohibition extends to cases that are not ripe. *Patterson,* 971 S.W.2d at 443. Yet the majority would authorize the trial court to enter an advisory opinion by allowing the trial court in this case to prematurely adjudicate Relator's intellectual-disability claim before he has been convicted of capital murder.

This Court has already considered and rejected a claim that Jonathan Bruce Reed was entitled to a pre-trial hearing to determine whether a lengthy delay in obtaining post-conviction relief had rendered mitigation evidence unavailable for his death-penalty retrial. *State ex rel. Watkins v. Creuzot,* 352 S.W.3d 493, 502–06 (Tex. Crim.App.2011). The State argued that the trial court could not preclude the death penalty for a death-penalty offense based upon the contingency that the defendant would be found guilty of capital murder, that a jury would find beyond a reasonable doubt that he would still be a future danger, and that a hypothetical jury would not answer the mitigation question in his favor because some witnesses and records were unavailable. *Id.* at 502. A majority of this Court agreed with the State, holding:

> The issue of the adequacy of Reed's mitigation case is not "fit" for judicial decision before it is presented. Here, a capital-murder defendant is seeking a pretrial declaratory judgment that any mitigation case that he might mount

---

**2.** In *Schriro,* the United States Supreme Court held that the Ninth Circuit exceeded its habeas jurisdiction by demanding that Arizona courts conduct a jury trial to resolve habeas corpus claims regarding intellectual disability when Arizona had not had the chance to implement its own chosen procedures. *Schriro,* 546 U.S. at 7–8, 126 S.Ct. 7. *Schriro* stands more for the proposition that a federal court cannot interfere with a state's ability to promulgate procedures for addressing intellectual-disability claims than it does for the idea that a trial court has discretion to

consider such claims prior to trial. Moreover, the United States Supreme Court has recently granted certiorari to determine whether *Ring v. Arizona* requires a jury determination of intellectual disability in a case in which the defendant was deprived of that jury determination. *See Hurst v. State,* 147 So.3d 435 (Fla.2014), *cert. granted,* —— U.S. ——, 135 S.Ct. 1531, 191 L.Ed.2d 558 (2015). But the majority's point is well-taken; *Atkins* does not explicitly require a jury determination of intellectual disability. *Briseno,* 135 S.W.3d at 10.

would necessarily be inadequate and therefore any prospective death sentence would, if it occurred, violate the Eighth Amendment, the Sixth Amendment, and the Due Process Clause. "These assumptions are simply not warranted before a jury has considered the evidence in the present case and rendered a verdict."

*Id.* at 505–06 (quoting *State ex rel. Lykos v. Fine,* 330 S.W.3d 904, 916 (Tex.Crim. App.2011)).

The majority distinguishes *Fine* and *Creuzot* by focusing upon the form of the motion before the trial courts in those cases. But this Court's holdings in those cases did not turn on the form of the motions. Rather, this Court granted mandamus relief because the real parties-in-interest had not yet been convicted. Regardless of the merit of the claims, the alleged constitutional injury was just as contingent upon future events in those cases as the alleged constitutional injury is in this case.[3]

I believe the same reasoning applies in this case. The United States Supreme Court has held only that the Eighth Amendment prohibits the imposition of the death penalty upon a defendant with intellectual disabilities. *Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Under existing law, it is a sentencing issue. Regardless of whether the determination that a defendant is intellectually disabled can be made by a judge or a jury, holding the hearing on the matter prior to a finding of guilt puts the cart before the horse and results in an advisory opinion. More simply, Allen's claim of intellectual disability is not ripe.

Because I believe allowing the pre-trial evidentiary hearing to consider the adequacy of Allen's intellectual-disability claim is inconsistent with this Court's prior precedent, I respectfully dissent.

---

**3.** It is worthwhile to note that both *Fine* and *Creuzot* were death-penalty cases in which the State had provided notice of its intent to seek the death penalty. Those notices had the same effect upon the nature of those cases as the notice does in this case. And the issues in both *Fine* and *Creuzot* do not appear to be any less remote than the issues in this case. Yet, a majority of this Court still held that mandamus relief was appropriate in both cases because the relators had not yet been convicted of capital murder.